**John Burgess, OSB No. 106498**
johnburgess@civilrightsoregon.com
**Carl Post, OSB No. 061058**
carlpost@civilrightsoregon.com
**SNYDER, POST AND BURGESS**
1000 SW Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249

**Abby Greenfield, OSB No. 243463**
abby@kedwards-law.com
**LAW OFFICE OF KATHARINE EDWARDS**
P.O. Box 417
Hillsboro, OR 97123
Telephone: (503) 664-0645
Attorneys for Plaintiff

# IN THE UNITED STATES DISCTRICT COURT

# IN THE DISTRICT OF OREGON

| | |
|---|---|
| **S.D.,** and **J.F.**, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>**MIKE REES**; **RYAN LEGORE**; **JEREMY WAGNER**; **MARK NOOTH**; **AARON REYES**; **JOHN DOES 1–5**; and **STATE OF OREGON**, by and through the Oregon Department of Corrections,<br><br>        Defendants. | Case No. 6:25-cv-01726-CL<br><br>**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>ORAL ARGUMENT REQUESTED |

PAGE 1 – **PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

LR 7-1 CONFERRAL CERTIFICATION ........................................................................ 8

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ........................................................................................ 8

I.    INTRODUCTION ............................................................................................... 8

II.    FACTUAL BACKGROUND ............................................................................ 11

    A.    ODOC's Policies and Practice Regarding Transgender Women ................. 11

    B.    Plaintiff J.F. ................................................................................................ 12

    C.    Plaintiff S.D. ............................................................................................... 15

    D.    Other Transgender Women's Experiences in ODOC Custody ................... 18

        1.    Jane Doe ............................................................................................ 18

        2.    S.S. .................................................................................................... 22

        3.    L.B. ................................................................................................... 23

    E.    Systemic Patterns ...................................................................................... 25

III.    LEGAL STANDARDS ...................................................................................... 26

    A.    Temporary Restraining Orders and Preliminary Injunctions ...................... 26

    B.    Eighth Amendment – Conditions of Confinement and Failure to Protect ... 28

    C.    Equal Protection – Sex and Transgender Status ........................................ 30

    D.    Oregon Constitution – Article I, §§ 13 and 16 .......................................... 30

    E.    PLRA – Narrowly Tailored Prospective Relief .......................................... 34

IV.    ARGUMENT ..................................................................................................... 35

    A.    Plaintiffs Are Likely to Succeed on the Merits .......................................... 35

        1.    Eighth Amendment – Ongoing Exposure to Sexual Violence and Dangerous Conditions ...................................................................... 35

        2.    Equal Protection – Discrimination Against Transgender Women .......... 40

        3.    Oregon Constitution – Cruel and Unusual Punishment and Unnecessary Rigor ...... 42

    B.    Plaintiffs Face Ongoing and Irreparable Harm .......................................... 44

    C.    The Balance of Equities Tips Sharply in Plaintiffs' Favor ......................... 47

    D.    The Public Interest Strongly Supports Injunctive Relief ............................ 48

    E.    The Requested Relief Complies with the PLRA ........................................ 50

F.     Class Certification Under Fed. R. Civ. P. 23(b)(2) ........................................................ 54

G.     Provisional Class Certification at the TRO and Preliminary Injunction Stage............. 57

V.     CONCLUSION................................................................................................................... 59

**TABLE OF AUTHORITIES**

Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ....................................................................................... 42

*Ahlman v. Barnes*,
  20 F.4th 489 (9th Cir. 2021) ............................................................................. 53, 58, 59

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ....................................................................................... 26

*Armstrong v. Brown*,
  768 F.3d 975 (9th Cir. 2014) ......................................................................................... 52

*Armstrong v. Newsom*,
  58 F.4th 1283 (9th Cir. 2023) ........................................................................................ 52

*Balla v. Idaho*,
  29 F.4th 1019 (9th Cir. 2022) ........................................................................................ 35

*Banks v. Booth*,
  459 F. Supp. 3d 143 (D.D.C. 2020) .......................................................................... 46, 49

*Beck v. Hurwitz*,
  380 F. Supp. 3d 479 (M.D.N.C. 2019) ........................................................................... 47

*Bedell v. Schiedler*,
  307 Or. 562, 770 P.2d 909 (1989) ..................................................................... 31, 34, 43

*Betschart v. Garrett*,
  700 F. Supp. 3d 965 (D. Or. 2023) .................................................................... 56, 58, 59

*Billings v. Gates*,
  323 Or. 167, 916 P.2d 291 (1996) .............................................................................. 33, 44

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ................................................................................................... 30, 40

*Brown v. Plata*,
  563 U.S. 493 (2011) ................................................................................................... 52, 54

*Cal. Coalition for Women Prisoners v. United States*,
  723 F. Supp. 3d 712 (N.D. Cal. 2024).......................................................................... 39

*Coleman v. Schwarzenegger*,
  922 F. Supp. 2d 882 (E.D. Cal. 2009)........................................................................... 50

*Cortes–Quinones v. Jimenez-Nettleship*,
  842 F.2d 556 (1st Cir. 1988), cert. denied, 488 U.S. 823 (1988).............................. 28, 35

*D.W. v. Fresenius Med. Care N. Am.*,
  534 F. Supp. 3d 1274 (D. Or. 2021).................................................................... 26, 45, 47

*Doe #1 v. Trump*
  414 F. Supp. 3d 1307 (D. Or. 2019).............................................................................. 45

*Doe v. D.C.*,
215 F. Supp. 3d 62 (D.D.C. 2016)................................................................36

*Doe v. Wash. State Dep't of Corr.*,
NO. 4:21-CV-5059-TOR, 2021 WL 2453099 (E.D. Wash. May 17, 2021) ........................36

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ................................................................41, 45, 51

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................ 26, 44

*Estelle v. Gamble*,
429 U.S. 97 (1976)................................................................ 29, 35

*Farmer v. Brennan*,
511 U.S. 825 (1994) ................................................ 28, 29, 30, 35, 36, 37, 38, 45

*Farnam v. Walker*,
593 F. Supp. 2d 1000 (C.D. Ill. 2009)................................................................47

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
746 F.2d 816 (D.C. Cir. 1984) ................................................................27

*Frost v. Agnos*,
152 F.3d 1124 (9th Cir. 1998)................................................................29

*Gilmore v. California*,
220 F.3d 987 (9th Cir. 2000) ................................................................35, 48, 50

*Goff v. Arizona*,
526 F. Supp. 3d 551 (D. Ariz. 2020)................................................................38

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001)................................................................34, 48, 50

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ................................................................42

*Hallett v. Morgan*,
296 F.3d 732 (9th Cir. 2002) ................................................................34

*Hearns v. Terhune*,
413 F.3d 1036 (9th Cir. 2005) ................................................................29

*Helling v. McKinney*,
509 U.S. 25 (1993)................................................................29, 30, 35

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ................................................................27

*Hudson v. Palmer*,
468 U.S. 517 (1984) ................................................................29, 35

*Innovation Law Lab v. Nielsen*,
310 F. Supp. 3d 1150 (D. Or. 2018)................................................................27

*Jordan v. Gardner*,
 986 F.2d 1521 (9th Cir. 1993) ...................................................................39

*Karnoski v. Trump*,
 926 F.3d 1180 (9th Cir. 2019).................................................... 30, 40, 42

*LaSeur v. Miller*,
 345 Or. App. 33 (2025) ...........................................................................32

*Laube v. Haley*,
 234 F. Supp. 2d 1227 (M.D. Ala. 2002) .................................... 28, 39, 49

*Lawson v. Cain*,
 323 Or. App. 730, 524 P.3d 529 (2023).................................... 31, 32, 33, 34, 43

*Maney v. Brown*,
 516 F. Supp. 3d 1161 (D. Or. Feb. 2, 2021) ...................................48, 53, 57, 59

*Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) .................................................... 26, 44

*Nat. Res. Def. Council v. Winter*,
 502 F.3d 859 (9th Cir. 2007) ...................................................................26

*Norsworthy v. Beard*,
 87 F. Supp. 3d 1104 (N.D. Cal. 2015)....................................... 40, 51

*Or. Nat. Desert Ass'n v. Bushue*,
 594 F. Supp. 3d 1259 (D. Or. 2022)..........................................................27

*Pacific Kidney & Hypertension, LLC v. Kassakian*,
 156 F. Supp. 3d 1219 (D. Or. 2016)..........................................................26

*Parents for Privacy v. Barr*,
 949 F.3d 1210 (9th Cir. 2020) ...................................................30, 40, 42, 46

*Parsons v. Ryan*,
 754 F.3d 657 (9th Cir. 2014) ....................................................54, 55, 56, 59

*Porretti v. Dzurenda*,
 11 F.4th 1037 (9th Cir. 2021) ................................................... 28, 46, 49

*Porter v. Clarke*,
 290 F. Supp. 3d 518 (E.D. Va. 2018), aff'd, 923 F.3d 348 (4th Cir. 2019)..........................46

*Rhodes v. Chapman*,
 452 U.S. 337 (1981) ................................................................. 29, 35

*Robinson v. Labrador*,
 747 F. Supp. 3d 1331 (D. Idaho 2024) .....................................................52

*Rodriguez v. Robbins*,
 715 F.3d 1127 (9th Cir. 2013)................................................... 26, 33, 44

*Sassman v. Brown*,
 99 F. Supp. 3d 1223 (E.D. Cal. 2015)......................................................41

*Schafer v. Maass*,
   122 Or. App. 518, 858 P.2d 474 (1993) ........................................................31, 32, 34, 43

*Schwenk v. Hartford*,
   204 F.3d 1187 (9th Cir. 2000) ........................................................................................ 29

*State v. Freudenthaler*,
   84 Or. App. 531, 734 P.2d 894, rev. den., 303 Or. 455 (1987) .......................................... 31

*Sterling v. Cupp*,
   290 Or. 611, 625 P.2d 123 (1981) ...........................................................30, 31, 34, 43

*Tay v. Dennison*,
   457 F. Supp. 3d 657 (S.D. Ill. 2020) .............................................................................. 36

*Trop v. Dulles*,
   356 U.S. 86 (1958) .................................................................................................. 29, 35

*Unique v. Claybaugh*,
   712 F. Supp. 3d 1265 (N.D. Cal. 2024) .......................................................................... 38

*Valandingham v. Bojorquez*,
   866 F.2d 1135 (9th Cir. 1989) ................................................................................. 29, 37

*Valentine v. Collier*,
   455 F. Supp. 3d 308 (S.D. Tex. 2020) ...................................................................... 46, 49

*Wilson v. Seiter*,
   501 U.S. 294 (1991) ................................................................................................ 28, 35

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7, 20 (2008) ...........................................................................26, 44, 53, 59

*Zepeda v. U.S. I.N.S.*,
   753 F.2d 719 (9th Cir. 1983) ......................................................................................... 57

*Zollicoffer v. Livingston*,
   169 F. Supp. 3d 687 (S.D. Tex. 2016) ............................................................................ 36

*Zombie v. State of Oregon, et al.*,
   No. 3:21-cv-01338-AA (D. Or. Sept. 8, 2023) ............................................................... 27

Statutes

18 U.S.C. § 3626(a)(1)(A) ...........................................................................34, 50, 54, 59
18 U.S.C. § 3626(a)(2) .................................................................................... 34, 35, 53
42 U.S.C. § 1983 .............................................................................................................. 58

Rules

Fed. R. Civ. P. 23 ...............................................................10, 54, 55, 56, 57, 58, 59

Constitutional Provisions

Article I, § 16 of the Oregon Constitution.............................................................. 43, 55

## LR 7-1 CONFERRAL CERTIFICATION

Plaintiffs' counsel has provided notice of this motion to Defendants and the Oregon Department of Justice, and counsel have conferred. Defendants oppose this motion

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs S.D. and J.F., individually and on behalf of a putative class of all current and future transgender women in Oregon Department of Corrections ("ODOC") custody, move this Court for a Temporary Restraining Order and Preliminary Injunction under Federal Rule of Civil Procedure 65. Plaintiffs seek narrowly tailored injunctive relief to protect them and other transgender women from ongoing and imminent risk of sexual assault, physical violence, psychological harm, and unconstitutional conditions in ODOC's male prisons.

This motion is supported by the Class Action Complaint, the declarations of J.F., Jane Doe, L.B., and S.S., the court's file and the authorities cited herein. Plaintiff requests oral argument.

## I.     INTRODUCTION

This case challenges the Oregon Department of Corrections' systemic failure to protect transgender women in its custody from sexual and physical violence, and the threat of such violence, and its practice of housing them in men's prisons under conditions that are dangerous, degrading, and inconsistent with their legal gender. Plaintiffs S.D. and J.F. are transgender women who are legally recognized as female and have long lived and presented as women. (J.F. Decl. ¶ 1; Dkt. 1, ¶¶ 58.) Yet ODOC continues to classify them as "male," houses them in men's facilities dominated by gangs and known predators, forces them to share cells with cisgender men who have sexually assaulted and beaten them, and punishes them with solitary confinement

when they seek protection or report abuse. (J.F. Decl. ¶¶ 2–8, 15; Dkt. 1, ¶¶ 58-68.) The declarations submitted with this motion show that their experiences are not isolated: other transgender women in ODOC custody have been raped, coerced into sex, beaten, threatened, and retaliated against when they attempt to report or avoid abuse. (Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.)

ODOC's own policies and the Prison Rape Elimination Act ("PREA") require intake screening for vulnerability to determine individualized housing decisions that meaningfully consider gender identity and safety and require measures such as separate showers and confidential reporting mechanisms to reduce the risk of sexual abuse. *See* Or. Dep't of Corr., DOC Policy 40.1.13, Prison Rape Elimination Act (effective Mar. 1, 2025).[1] In practice, ODOC instead treats transgender women as men, houses them almost exclusively in men's prisons, subjects them to cross-gender strip searches (unless there happens to be a willing female staff person on duty at the time of the search) and repeated exposure of their nude bodies to male prisoners and staff, and tells them that they must either remain in general population with their abusers or accept "protective" solitary confinement that strips them of programming and basic human dignity. (J.F. Decl. ¶¶ 4–10, 14–15, 17–21; Dkt. 1, ¶¶ 58-68.)

When transgender women report rape and harassment, they are often disbelieved, punished, or moved into even more dangerous units. PREA officers have told them they will not be believed and instructed them to stop calling the hotline, investigators have revealed confidential complaints to the very staff members accused of misconduct, and victims have been disciplined or transferred in retaliation for reporting. (Doe Decl. ¶¶ 4–10; Dkt. 1, ¶¶ 63-68.) In one instance, J.F. became so distraught at being told she would be moved to a unit where staff

---

[1] https://www.oregon.gov/doc/rules-and-policies/Documents/40-1-13-prea.pdf

warned she would likely be assaulted that she cut an artery in her leg and required emergency hospitalization; on her return, she was placed in a filthy suicide-watch cell with no bed or privacy and treated as if she were being punished. (J.F. Decl. ¶¶ 8–10.)

The Constitution does not permit prison officials to knowingly expose prisoners to a substantial risk of sexual assault and serious physical harm. For more than thirty years, the Supreme Court and the Ninth Circuit have held that the Eighth Amendment requires prison officials to take reasonable measures to guarantee prisoners' safety and not to be deliberately indifferent to risks of serious harm, including the risks faced by transgender women housed in male facilities. The Equal Protection Clause likewise forbids the State from treating transgender women differently from similarly situated cisgender women based solely on sex and gender identity, without an exceedingly persuasive justification. The Oregon Constitution independently prohibits cruel and unusual punishment and unnecessary rigor.

Plaintiffs bring this case as an injunction class action under Rule 23(b)(2) on behalf of all current and future transgender women in ODOC custody. They seek only declaratory and injunctive relief. Through this motion, Plaintiffs ask the Court to provisionally certify a Rule 23(b)(2) class for purposes of preliminary relief and to enter a Temporary Restraining Order, followed by a Preliminary Injunction, requiring ODOC to implement basic, PREA-consistent protections for transgender women. The requested relief is narrowly tailored and consistent with the PLRA. It requires ODOC to conduct individualized housing and safety assessments for each transgender woman, taking into account her stated preferences, current transition status, and security needs. Transgender women must be offered safe, non-punitive options, including as appropriate: (i) placement in a women's facility consistent with their gender identity, (ii) placement in a dedicated transgender or gender-nonconforming unit, or (iii) continued placement

in a men's facility when they request it and it is compatible with legitimate security concerns. ODOC must review these placements on a regular schedule, provide written reasons for any denial of the requested option, ensure basic bodily privacy and appropriate staffing for strip searches, and maintain confidential, non-retaliatory procedures for reporting and responding to sexual abuse.

Without immediate intervention, Plaintiffs and other transgender women will remain at daily risk of rape, assault, and severe psychological harm. (J.F. Decl. ¶¶ 20-21; L.B. Decl. ¶¶ 3–8; Dkt. 1, ¶ 68.) This motion asks the Court to enforce the minimum constitutional and statutory protections required for their safety, on a classwide basis, while allowing ODOC reasonable flexibility in how it implements those protections across its facilities.

## II. FACTUAL BACKGROUND

### A. ODOC's Policies and Practice Regarding Transgender Women

ODOC's written PREA policy, Policy 40.1.13, mirrors federal PREA standards by requiring intake screening for vulnerability, individualized determinations of housing and safety, and measures to reduce the likelihood of sexual abuse and harassment. PREA likewise mandates that decisions whether to house a transgender inmate in a male or female facility be made on a case-by-case basis, considering the inmate's own views of safety, and that transgender inmates be given an opportunity to shower separately from others.

Despite these written standards, ODOC's actual practice is to house transgender women by birth sex or genitalia, almost invariably in men's prisons. Transgender women are typically classified as "male" at intake and transferred to male institutions, with no meaningful consideration of their gender identity or vulnerability, and no presumption in favor of Coffee Creek Correctional Facility (CCCF) (Oregon's women's prison) or other safe placements. (J.F.

Decl. ¶¶ 1–3; Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.) Staff routinely ignore documented markers of vulnerability, including prior sexual victimization, feminine presentation, physical size and vulnerability, and medical diagnoses of gender dysphoria. (J.F. Decl. ¶¶ 1–3.)

Instead of providing safe, non-punitive alternatives, ODOC presents transgender women with a false choice: remain in general population units with cisgender men who harass, assault, and rape them, or accept "protective" solitary confinement that strips them of programming, community, and basic human dignity. (J.F. Decl. ¶¶ 4–8, 17–21.) Even when ODOC identifies someone as "vulnerable," that designation does not reliably lead to safe housing or protection from known abusers. (Doe Decl. ¶¶ 4–10.)

**B. Plaintiff J.F.**

J.F. is a transgender woman who is legally recognized as female. She has been on hormone therapy for several years and is in the process of obtaining gender-affirming surgery. (J.F. Decl. ¶ 1.) Despite this, and despite being designated by ODOC as a "vulnerable" inmate, she has repeatedly been housed with cisgender men and sexually assaulted by multiple cellmates during her incarceration. (J.F. Decl. ¶ 2.)

During her first PREA review at TRCI in 2019, an officer questioned why she was not housed at CCCF, noting that she presented as female and stating that it was unsafe for her to remain in a male facility. (J.F. Decl. ¶ 3.) He told her he would recommend reconsidering her housing placement, but nothing changed. (*Id.*)

Over the years, J.F. has spent long periods in solitary confinement to try to protect herself from abuse. (J.F. Decl. ¶ 4.) At TRCI, staff forced her to live with men and repeatedly rotated her cellmates. (*Id.*) One cellmate initially seemed kind but became violent and coercive. When she

refused to have sex with him, he attacked her while she was sleeping, fracturing her orbital socket. (*Id.*) She required hospitalization. (*Id.*) Despite this, ODOC punished her for the incident, labeled her the aggressor, and PREA investigators dismissed her report as false. (*Id.*)

On another occasion, staff placed her in a cell with a known gang member despite her warnings. (J.F. Decl. ¶ 5.) Both she and the other prisoner told Officer L. that the placement was unsafe, but staff said their only alternative was segregation. (*Id.*) After the other prisoner's peers taunted him for living with a transgender woman, he became enraged and raped her. (*Id.*) She cried for help, but staff did nothing until someone outside the facility intervened. (*Id.*)

TRCI staff have repeatedly disclosed J.F.'s PREA reports to the very inmates she reported. (J.F. Decl. ¶ 6.) After she filed a complaint against one gang member, staff told the inmate she had reported him, leaving her exposed to retaliation. (*Id.*) He later assaulted her, and she was once again punished instead of protected. (*Id.*)

In December 2023, at Snake River Correctional Institution (SRCI), J.F. was housed with AIC X, a known sexual predator who sexually harassed her and demanded sex. (J.F. Decl. ¶ 7.) She reported his behavior, but no investigation occurred and she was left in the cell with him. (*Id.*)

Later, staff told her she would be moved to a unit where she was "likely to be assaulted." (J.F. Decl. ¶ 8.) Distraught and terrified, she attempted suicide by cutting an artery in her leg. (*Id.*) She lost consciousness and required emergency hospitalization. (*Id.*) When she returned to SRCI, staff placed her on suicide watch in a filthy, unheated cell with urine on the floor. (*Id.*) In that cell, she was forced to expose her nude body to male inmates passing by because she had no privacy when using the toilet or changing clothes. (J.F. Decl. ¶ 9.) She experienced this treatment as punitive and degrading rather than protective. (*Id.*)

J.F. reports that correctional officers at SRCI routinely curse at and demean her. (J.F. Decl. ¶ 10.) One officer coerced her and another transgender woman, S.D., into sexual acts and recorded them on his personal cellphone. (*Id.*) The investigator assigned to their PREA complaint found their claims "unsubstantiated" despite clear evidence and was later terminated for sexual misconduct with another inmate. (J.F. Decl. ¶ 11.)

Around the same time, J.F. reported a Behavioral Health Services manager, G., for sexual misconduct. (J.F. Decl. ¶ 12.) The investigator told G. about her report, and G. retaliated by transferring J.F. to another prison where she was attacked in a hate-motivated assault. (*Id.*) Although the incident was found to be self-defense, J.F. was punished. (*Id.*)

J.F. has been physically attacked by gang members in multiple facilities. (J.F. Decl. ¶ 13.) In 2024, at SRCI, two men jumped her in the gym while shouting slurs. (*Id.*) Even though it was clear she was the victim; she was disciplined and placed in segregation. (*Id.*) In another incident, a man choked her and struck her in the face while shouting hate speech. (J.F. Decl. ¶ 14.) She hit him once to escape because she could not breathe, and she was found guilty of assault. (*Id.*)

At SRCI, J.F. was repeatedly forced to perform sexual acts in the gym for male inmates under threat of violence. (J.F. Decl. ¶ 15.) She sometimes deliberately provoked altercations so that she would be sent to segregation, which she saw as her only means of escape from ongoing sexual abuse. (*Id.*) When she reported an AIC for groping her, the PREA captain required him to "apologize" but imposed no discipline. (J.F. Decl. ¶ 16.) He later confronted J.F., threatened her, and demanded that she withdraw her complaint. (*Id.*)

Her current housing offers no meaningful privacy. (J.F. Decl. ¶ 17.) Her cell has large windows and staff frequently open the door without warning—exposing her while she is using the toilet or changing clothes. (*Id.*) Showers lack privacy screens, allowing men to watch her

undress and bathe. (*Id.*) She is denied feminine items that are available to women at CCCF, such as cosmetics, hair styling tools, and properly fitting clothing. (J.F. Decl. ¶ 18.) Instead, she is issued men's clothing that does not fit her body and worsens her gender dysphoria and humiliation. (*Id.*)

Staff and other inmates constantly harass her and direct slurs at her, calling her a "freak" or "faggot" and falsely labeling her a child molester. (J.F. Decl. ¶ 19.) She is targeted sexually and lives under continuous threat. (*Id.*) Reporting harassment or abuse only makes her more vulnerable because staff routinely fail to protect her and sometimes retaliate when she complains. (*Id.*)

J.F. states that she has been assaulted by men in *every* ODOC facility where she has been housed. (J.F. Decl. ¶ 20.) Male officers still conduct her strip searches, which retraumatizes her in light of her prior sexual abuse by staff. (*Id.*) She explains that the rise in anti-trans rhetoric has made her situation worse: gangs extort and threaten her, and she lives in daily fear of being raped or killed. (J.F. Decl. ¶ 21.) ODOC has not provided meaningful protection or a safe placement despite knowing her history and her legal female status. (*Id.*)

### C. Plaintiff S.D.

S.D. is a named plaintiff in this action. Plaintiff S.D. is a transgender woman currently incarcerated in the custody of the ODOC. Dkt. 1, ¶ 58. She has a legal female gender marker under Oregon law and a long-documented history of gender dysphoria, PTSD, suicidality, and vulnerability to sexual violence. *Id.* Despite this, ODOC has repeatedly housed S.D. in general population men's facilities, including OSCI, without adequate protections or individualized placement review. *Id.*

S.D.'s history with ODOC includes a prior incarceration during which she was repeatedly sexually assaulted, coerced, harassed, and exploited. Dkt. 1, ¶ 59. During that prior term, she was preyed upon by an ODOC correctional officer—Reuben Benavidez—who engaged in a pattern of escalating sexual abuse involving both S.D. and another transgender cellmate. *Id.* Benavidez routinely entered their cell under false pretenses, made sexually explicit comments, and ultimately coerced the two inmates into performing sex acts while he watched and recorded with his personal cell phone. *Id.*

Despite ODOC's knowledge of S.D.'s transgender status and her documented risk factors under ODOC Policy 40.1.13 (including gender nonconformity, history of trauma, and expressed fear for her safety), she was housed in a cell with an inmate with a known propensity for sexual violence and assigned to a unit where she faced harassment from staff and inmates alike. Dkt. 1, ¶ 60. Her requests for protection and transfer were ignored or dismissed. When she attempted to report the abuse, she was mocked and told by staff that she needed to "man up" because she was "in a man's prison." *Id.* She was routinely misgendered and called a "fag," "freak," and other slurs by ODOC employees. *Id.*

Rather than protecting S.D., ODOC responded to her reports by placing her in disciplinary segregation, further isolating her and compounding her trauma. Dkt. 1, ¶ 61. She was not offered trauma counseling or mental health support during this time. *Id.* The experience severely destabilized her mental health and left her in a state of extreme psychological distress. *Id.*

S.D. filed a federal civil rights action based on the sexual abuse and deliberate indifference she experienced during that earlier incarceration. Dkt. 1, ¶ 62. That lawsuit was

resolved by settlement in March 2025. *Id.* S.D. was released from custody but subsequently reincarcerated following a parole violation or new conviction. *Id.*

Despite her previous litigation and ODOC's full knowledge of her history of victimization and gender identity, ODOC has placed S.D. back into men's prisons, including OSCI, where she is once again exposed to many of the same threats and systemic failures. Dkt. 1, ¶ 63. She was housed in male general population units throughout her incarceration, surrounded by cisgender men, without individualized review of her safety needs or consideration of alternatives like transfer to CCCF. *Id.*

Since her reincarceration, S.D. has again experienced verbal harassment from staff and inmates, including transphobic slurs and threats. Dkt. 1, ¶ 64. She has been housed in units with known aggressors and placed in double cells with men without screening for compatibility or safety. *Id.* Correctional officers continue to misgender her and have intentionally referred to her using male pronouns and her "dead name" in front of other inmates, endangering her and subjecting her to humiliation and abuse. *Id.*

On multiple occasions, S.D. has attempted to invoke the protections afforded under PREA and ODOC Policy 40.1.13. Dkt. 1, ¶ 65. Her efforts have been ignored, delayed, or retaliated against. Grievances have gone unanswered or been dismissed without investigation. *Id.* She has been threatened with disciplinary action for "lying" or "misusing the grievance process" when she reported threats or unsafe housing conditions. *Id.*

Despite meeting multiple "vulnerability" factors outlined in ODOC's own policies—including her gender identity, prior history of victimization, and ongoing mental health diagnoses—S.D. has not been designated as a Vulnerable Inmate. Dkt. 1, ¶ 66. ODOC has

refused to conduct a full classification review and continues to house her as if she were a cisgender man. *Id.*

The psychological impact of this treatment has been severe. S.D. has experienced suicidal ideation, panic attacks, insomnia, and retraumatization from being placed back into a system that failed to protect her before. Dkt. 1, ¶ 67. Rather than receiving gender-affirming care and support, she has been subject to retraumatization at the hands of the same system. *Id.*

S.D. remains at risk of serious physical and psychological harm while ODOC continues to house her in a facility that fails to account for her gender identity, history of sexual assault, and constitutional rights. Dkt. 1, ¶ 68. She brings this action to prevent further violations of her rights and to obtain systemic injunctive relief on behalf of herself and all similarly situated transgender women incarcerated in ODOC custody. *Id.*

**D. Other Transgender Women's Experiences in ODOC Custody**

The experiences of other transgender women in ODOC custody confirm that Plaintiffs S.D. and J.F. are not outliers, but examples of a system-wide pattern in which transgender women are housed in men's prisons, exposed to extreme risk of sexual and physical violence, and denied meaningful protection or PREA-compliant responses.

**1. Jane Doe**

Jane Doe ("Doe") is a transgender woman who has been on gender-affirming hormones for years and recently underwent vulvoplasty. She has long been legally recognized as female. (Doe Decl. ¶¶ 1, 37.) From the time she began presenting as a woman in approximately 2019, she has been subjected to persistent verbal abuse and sexual harassment by both staff and other adults in custody. (Doe Decl. ¶ 2.) Before she transitioned socially, she did not experience this level of harassment; it escalated when she began to live openly as a woman and advocated for a

transgender friend who was being mistreated. (Doe Decl. ¶¶ 2–4.) Male correctional officers have repeatedly strip-searched her in view of male prisoners and staff, while making transphobic comments and discussing her genitals. (Doe Decl. ¶¶ 4–5.)

Around October 2020, after months of verbal threats and harassment by another incarcerated man—often made in front of ODOC staff—Doe was assaulted in the dayroom. (Doe Decl. ¶ 6.) The man punched her in the mouth and back while staff stood by and failed to intervene. (Doe Decl. ¶ 6.) In the months that followed, Doe repeatedly requested transfer to CCCF, explaining that as a woman in a men's prison she could not be kept safe. (Doe Decl. ¶ 7.) Her requests were denied. (*Id.*)

From about March 2020 to June 2021, ODOC housed Doe with a known sexually violent offender who told her he had been sent to segregation for PREA violations involving another transgender woman. (Doe Decl. ¶ 8.) He repeatedly sexually and physically assaulted her and forced her into a non-consensual "relationship" under threat of harm from other inmates. (*Id.*) When Doe twice attempted to report this to the PREA Compliance Manager, she was told that her only alternative was to move to an open cell on mainline and was subsequently told that she would "get over it." (Doe Decl. ¶ 9.) No formal PREA investigation began until she filed a tort claim notice in July 2021. (Does Decl. ¶ 10.) Even then, her assailant was allowed to leave segregation to work his job, and other prisoners threatened her for being a "snitch." (Doe Decl. ¶¶ 9–10.)

Doe was later groped and assaulted in the recreation yard by another inmate who had threatened her for months; threats that ODOC staff had repeatedly ignored. (Doe Decl. ¶ 11.) She was eventually transferred to CCCF, but only briefly. (Doe Decl. ¶ 12.) Staff and inmates there treated her "like a man," and she believes the transfer was used to prove she did not "belong"

there—not to keep her safe. (*Id.*) She was then returned to a men's prison and placed in segregation. (Doe Decl. ¶¶ 12–13.) After leaving segregation, ODOC again assigned her to live with a known violent sex offender who immediately began sexually harassing her. (Doe Decl. ¶ 14.) She was placed in an active gang unit where gangs enforced a "policy" that transgender prisoners could not use the phones—cutting her off from PREA reporting and her lawyers. (Doe Decl. ¶15.)

Although ODOC designates Doe as a "vulnerable inmate," that label has not protected her. From December 24, 2022, through January 12, 2023, her cellmate repeatedly sexually harassed, assaulted, and raped her. (Doe Decl. ¶ 16.) She repeatedly told staff that she felt unsafe and described being treated like a "sex toy," but her pleas were dismissed. (Doe Decl. ¶¶ 16–17.) On January 11, 2023, he raped her; the next day he tried to force her to masturbate him. (Doe. Decl. ¶ 18.) When she begged a correctional officer to move her, she was pressed for "specifics" which she was terrified to give for fear of being branded a liar. (Doe Decl. ¶ 19.) The correctional officer sent her back to the same cell, where she was once again assaulted by her cellmate. (Doe Decl. ¶¶ 18–20.)

When Doe finally managed to report another assault, she told staff there was still bodily fluid on her. (Doe Decl. ¶ 21.) Instead of securing evidence and immediately transporting her to a hospital, staff told her to change clothes, leave the soiled clothing in the cell, and walk to Security Operations. (*Id.*) She was not taken for a rape exam for roughly seven hours. (Doe Decl. ¶ 22.) During that time, she was required to undress in front of male staff, her clothing was not preserved as evidence, and she was made to stand and repeatedly recount what happened while begging to go to a hospital. (Doe Decl. ¶¶ 21–22.) Her attacker remained in the same institution for approximately eight months, during which she feared seeing him at medication line or meals

and sometimes skipped both to avoid him. (Doe Decl. ¶ 23.) He was transferred only after hearings began on her request for a temporary restraining order, and ODOC did not restrict his ability to send her mail until weeks later. (Doe Decl. ¶¶ 23–24.)

Even after she obtained single-cell housing, Doe remained exposed and unsafe. In August 2023, another inmate repeatedly punched the back of her head in the medication line until she lost consciousness; staff pepper-sprayed him but then handcuffed her next to her own vomit, treated her as the perpetrator, and placed her in disciplinary segregation. (Doe Decl. ¶¶ 25–26.) Male staff made her remove her shirt so they could photograph her injuries. (*Id.*) Her cell during this period was directly in front of areas where other prisoners line up for showers, tablets, and phones, leaving groups of men gathered outside her door and giving male officers an unobstructed view of her when she used the toilet or changed clothes. (Doe Decl. ¶ 27.)

On the day she won a TRO in her earlier federal case, a lieutenant told her a privacy screen would be installed in her cell; a rack was put up, then removed 24 hours later after "stakeholders" objected. (Doe Decl. ¶ 28.) Only after the curtain was removed—and after media attention to her case—that was she placed in protective custody. (Doe Decl. ¶ 29.) Even then, she was retaliated against, including being given a mattress with large holes that forced her to sleep on the floor, and she continued to be sexually harassed and verbally abused. (Doe Decl. ¶¶ 30–31.)

In November 2023, despite a court order limiting cross-gender strip searches, Doe was locked in a small cage and told she could not leave until she submitted to a urine test and strip search by male staff. (Doe Decl. ¶ 32.) When she asked for a female officer consistent with the injunction, staff refused, left her in the cage until she urinated on herself, and then kept her there in urine-soaked underwear. (Doe Decl. ¶¶ 32-33). Eventually, exhausted and humiliated, she

submitted to a strip search by a male officer while a female officer watched, then was marched through the DSU hallway in only her bra and underwear. (Doe Decl. ¶ 34.) She was punished with roughly 30 days in DSU for "refusing" a UA even though she had only requested that ODOC follow the court's order. (Doe Decl. ¶ 35.) Even under an existing injunction, she remained unsafe and exposed to ongoing harassment by staff and prisoners. (Doe Decl. ¶ 36.)

Doe is now housed at CCCF after her vulvoplasty, which has reduced some of the constant physical danger she faced in men's prisons. (Doe Decl. ¶ 37.) Yet she continues to be misgendered and treated differently from cisgender women, and she lives with ongoing fear that ODOC will send her back to a men's facility at any time. (*Id.*)

### 2. S.S.

S.S. is a transgender woman whose gender is legally recognized as female. ODOC's own records classify her as female, yet for approximately six years she has been housed at Two Rivers Correctional Institution ("TRCI"), a men's prison. (S.S. Decl. ¶¶ 1–3.) While at TRCI she has been subjected to verbal, emotional, and psychological abuse by both staff and other adults in custody because of her sex and gender identity. (S.S. Decl. ¶ 4.)

On or about September 3, 2023, S.S. was sexually assaulted by her cellmate. (S.S. Decl. ¶ 5.) Before the assault, she told ODOC and Oregon State Penitentiary staff that housing her with this person would put her at risk. (S.S. Decl. ¶ 6.) Despite her explicit warnings, staff ignored her concerns, made no adequate protective housing changes, and left her in the same cell. (S.S. Decl. ¶¶ 5–6.)

After the assault, ODOC did not separate her from her attacker or move her to a safe unit. (S.S. Decl. ¶ 6.) She was denied immediate medical care and did not receive a forensic rape exam for eight days, compounding her trauma and increasing the risk of disease. (S.S. Decl. ¶ 7.)

ODOC and TRCI officials failed to provide counseling, trauma-informed care, or the PREA-mandated protections she should have received as a sexual assault survivor. (S.S. Decl. ¶ 8.) She was not offered confidential support services or timely mental health treatment. (*Id.*) Instead, she was retaliated against for reporting, including being left in the same unit as her attacker and denied required medical and psychological services. (S.S. Decl. ¶ 9.) As a result, she has suffered severe and ongoing physical pain, emotional trauma, and worsening gender dysphoria. (S.S. Decl. ¶ 10.) She attests that ODOC staff failed to follow federal and Oregon law governing safety, vulnerability classification, and mandatory reporting of sexual assault. (S.S. Decl. ¶ 11.)

### 3. L.B.

L.B. is a transgender woman who has been on hormone replacement therapy for more than five years and has been legally recognized as female for several years. She is currently awaiting gender-affirming surgery. (L.B. Decl. ¶ 1.) ODOC designates her as a "potentially vulnerable" inmate based on her transgender status and gender dysphoria diagnosis but continues to house her in men's prisons. (L.B. Decl. ¶ 2.)

Shortly after entering ODOC custody, L.B. began submitting grievances and kytes requesting safer housing and, where possible, transfer to less violent facilities. (L.B. Decl. ¶ 4.) She reported repeated sexual harassment by other inmates, fear of using the gym because of harassment, and sexual harassment by her cellmate, including an incident where he groped her chest. (L.B. Decl. ¶¶ 3–4.) Towards the end of 2021, she was physically assaulted in a corridor and again sexually harassed by the same cellmate. (L.B. Decl. ¶ 5.) To her knowledge, no report was filed, and ODOC forced her to remain housed with the assailant for months. (L.B. Decl. ¶ 5.)

Multiple medical professionals have evaluated L.B. for gender dysphoria and related mental health needs. (L.B. Decl. ¶ 6.) A therapist concluded she was a target of discrimination

because of her gender dysphoria and recommended additional treatment and transfer to a women's facility for her safety and well-being. (L.B. Decl. ¶ 7.) A licensed clinical social worker subsequently recommended medical interventions and weekly counseling with a provider experienced in treating gender dysphoria. (L.B. Decl. ¶ 7.) Despite those recommendations, ODOC has refused to transfer her to CCCF.

L.B. wrote to ODOC's Transgender and Intersex Accommodation Committee (TAIC) explaining that she could not safely shower or change clothes without being watched by male inmates and again pleaded for a transfer, which was denied. (L.B. Decl. ¶ 8.) Her mental health deteriorated to the point that she engaged in self-harm after being celled with someone she had previously reported. (L.B. Decl. ¶ 9.) She later suffered a severe assault in a corridor in which another inmate repeatedly punched her in the head, forcing her to the ground. (L.B. Decl. ¶ 10.) OC spray used by ODOC staff during the attack disoriented her further. (*Id.*)

Although she was the victim of a hate crime, ODOC treated her as the perpetrator, accused her of failing to follow orders, and placed her in disciplinary segregation until a hearing eventually cleared her. (L.B. Decl. ¶ 10.)

Despite her history, ODOC continued to place her with cellmates who harmed or sexually assaulted her, including one who groped her again while staff ignored her report. (L.B. Decl. ¶ 11.) For years she lived in general population housing at Snake River Correctional Institution ("SRCI") in complexes 2 and 3, which she repeatedly reported were dangerous for her. (L.B. Decl. ¶ 12.) She asked to be moved to complex 1, which she understood to be safer, in communications to both the prison superintendent and the superintendent of security, but her requests were ignored. TAIC also declined to change her housing. (L.B. Decl. ¶ 12.)

When L.B. finally turned to the PREA lieutenant, she was moved to complex 1 for safety—only to have a captain move her back to a dangerous unit the very next day. (L.B. Decl. ¶ 13.) L.B. believes this move was retaliatory because that captain had been called as a witness in one of her prior habeas cases. (L.B. Decl. ¶ 13.) She has observed ODOC staff using their authority to move prisoners into dangerous units where they are likely to be targeted as retaliation for lawsuits and grievances. (L.B. Decl. ¶ 14.)

L.B. has multiple mental health diagnoses that have been unnecessarily worsened by ODOC's repeated failures to protect her. (L.B. Decl. ¶ 15.) She lives in debilitating, ongoing fear of assault with "no one to turn to for protection," despite clear medical recommendations that she be transferred to CCCF and provided consistent gender-affirming care. (L.B. Decl. ¶¶ 16–18.)

**E. Systemic Patterns**

Taken together, the experiences of Doe, S.S., L.B., and the named Plaintiffs show a consistent, system-wide pattern: ODOC places transgender women in men's prisons despite knowing they are extremely vulnerable; disregards explicit warnings about dangerous placements and known predators; treats credible reports of sexual assault and threats as nuisances rather than emergencies; delays or denies medical and mental health care; misuses segregation and housing moves as punishment and retaliation; and fails to implement even basic PREA safeguards, including confidential reporting, timely investigations, and protection from retaliation. (J.F. Decl. ¶¶ 2–8, 10–21; Doe Decl. ¶¶ 2–12, 15–25, 27–37; S.S. Decl. ¶¶ 2–7; L.B. Decl. ¶¶ 3–8.)

### III. LEGAL STANDARDS

#### A. Temporary Restraining Orders and Preliminary Injunctions

To obtain a TRO or preliminary injunction, Plaintiffs must show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit applies a "sliding scale" approach under which a plaintiff may also obtain relief by raising "serious questions going to the merits" and showing that the balance of hardships tips sharply in her favor, so long as the other two *Winter* factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011); *see Nat. Res. Def. Council v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007), *rev'd on other grounds*, *Winter*, 555 U.S. 7.

The Ninth Circuit has recognized that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). That principle applies with particular force where, as here, Plaintiffs face a substantial and ongoing risk of serious physical harm.

Federal courts in this District regularly apply *Winter* and recognize the Ninth Circuit's "serious questions" variant of the preliminary injunction test. *See Pacific Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 (D. Or. 2016) (explaining that a plaintiff may obtain preliminary relief by showing "serious questions going to the merits" and that the balance of hardships tips sharply in the plaintiff's favor, so long as the remaining *Winter* factors are satisfied); *D.W. v. Fresenius Med. Care N. Am.*, 534 F. Supp. 3d 1274, 1279 (D. Or. 2021) (same, citing *Alliance for the Wild Rockies*, 632 F.3d at 1131-32).

Because Plaintiffs seek mandatory relief that will require ODOC to take affirmative steps to change housing and safety practices for transgender women, the Court may also apply the heightened standard for mandatory injunctions. Under that standard, a plaintiff must show that the facts and law clearly favor her position and that "extreme or very serious damage" will result in the absence of relief. *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156-57 (D. Or. 2018) (granting mandatory relief to ensure access to counsel for detained immigrants); *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions are most likely to be appropriate when 'the status quo ... is exactly what will inflict the irreparable injury upon complainant.'")(quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984)).

At the preliminary injunction stage, the Court is not required to confine itself to evidence that would be admissible at trial so long as it bears indicia of reliability. *Or. Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1263 (D. Or. 2022) (citations omitted). Plaintiffs' detailed sworn declarations easily satisfy that standard.

Courts applying these standards in the prison context—including in Eighth Amendment deliberate-indifference cases—regularly grant temporary and preliminary relief where incarcerated people face a substantial risk of serious harm.

In this District, Judge Aiken recently granted a TRO for a transgender woman in ODOC custody who had been repeatedly raped by cellmates with known sex-offense histories, despite her repeated reports and pleas for protection. *See Zombie v. State of Oregon, et al.*, No. 3:21-cv-01338-AA (D. Or. Sept. 8, 2023) (finding a high likelihood of success on an Eighth Amendment failure-to-protect claim and irreparable harm where ODOC housed plaintiff with men convicted of sex crimes and failed to separate her from prior assailants; ordering ODOC to designate her a

vulnerable AIC, prohibit double-celling, prevent her from being viewed nude by male AICs and staff or forced to shower or dress in their view, and ensure she would not encounter former cellmates who had sexually assaulted her at meals or medication lines).

In *Porretti v. Dzurenda*, 11 F.4th 1037, 1045–50 (9th Cir. 2021), the Ninth Circuit affirmed a preliminary injunction requiring prison officials to provide specific psychiatric medications, holding that the district court "carefully applied the preliminary-injunction factors" and properly found both a likelihood of success on the Eighth Amendment claim and irreparable harm in the form of "very serious or extreme damage to [the prisoner's] mental health" absent relief. Likewise, in *Laube v. Haley*, 234 F. Supp. 2d 1227, 1232–36, 1252–53 (M.D. Ala. 2002), the district court granted preliminary injunctive relief to women incarcerated at an Alabama prison where severe overcrowding, open-dorm housing, and inadequate supervision created a substantial risk of serious harm, including physical and sexual assault. The court held that the plaintiffs were likely to succeed on their Eighth Amendment claim and that the risk of serious harm to prisoners outweighed any administrative or logistical burdens on prison officials. These cases illustrate that preliminary relief is appropriate where, as here, prison policies and practices expose a vulnerable group of prisoners to constant risk of serious injury, here, physical and sexual violence.

**B. Eighth Amendment – Conditions of Confinement and Failure to Protect**

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," including a duty to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832–34 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988), cert. denied, 488 U.S. 823 (1988)), and citing *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Hudson v. Palmer*, 468 U.S. 517,

526–27 (1984); *Estelle v. Gamble*, 429 U.S. 97, 102–04 (1976); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). A prisoner states a claim for unconstitutional conditions of confinement where she is incarcerated under conditions posing a substantial risk of serious harm and officials act with "deliberate indifference" to that risk. *Farmer, supra,* at 834.

The deliberate indifference standard has both an objective and subjective component. Objectively, the deprivation must be sufficiently serious, exposing the prisoner to a substantial risk of serious harm, including threats to physical safety or health. *See Helling v. McKinney*, 509 U.S. 25, 33–35 (1993); *Farmer*, 511 U.S. at 834. Subjectively, the official must actually know of and disregard the excessive risk; knowledge may be inferred from circumstantial evidence where the risk is obvious. *Farmer*, 511 U.S. at 837, 842–43.

*Farmer* specifically recognized that placing a pre-operative transgender woman who "acts in a feminine manner" in a general male population can evidence deliberate indifference to a substantial risk of sexual assault. *Id*. at 829, 848–49. The Ninth Circuit has likewise held that sexual abuse of a transgender prisoner by staff violates the Eighth Amendment, *Schwenk v. Hartford*, 204 F.3d 1187, 1196-98 (9th Cir. 2000), and that prison officials may be deliberately indifferent where they knowingly expose vulnerable prisoners to attacks by known aggressors or hostile groups. *See also Valandingham v. Bojorquez*, 866 F.2d 1135, 1139 (9th Cir. 1989) (labeling prisoner a "snitch" in front of other inmates states Eighth Amendment claim); *Hearns v. Terhune*, 413 F.3d 1036, 1040-1041 (9th Cir. 2005) (allegations that officials knew of risks of religiously motivated attacks and facilitated them stated deliberate indifference claim); *Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998) (placing prisoner who used crutches in unit with non-accessible showers despite complaints showed deliberate indifference to safety).

Injunctive relief is appropriate where there is a continuing risk of harm and officials persist in deliberate indifference. *Farmer*, 511 U.S. at 845–47; *Helling*, 509 U.S. at 33–35.

### C. Equal Protection – Sex and Transgender Status

The Equal Protection Clause prohibits states from intentionally treating similarly situated individuals differently without a sufficient justification. Policies that discriminate based on sex are subject to at least intermediate scrutiny, and discrimination against transgender persons is a form of sex discrimination subject to heightened scrutiny. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1227–31 (9th Cir. 2020) (recognizing that discrimination against transgender individuals implicates sex-based classifications under Equal Protection and Title IX); *Karnoski v. Trump*, 926 F.3d 1180, 1200–02 (9th Cir. 2019) (plurality) (applying heightened scrutiny to policies targeting transgender people); *cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 658–59, 662, (2020) (holding under Title VII that discrimination against transgender persons is discrimination "because of sex").

To prevail, Plaintiffs must show that Defendants intentionally discriminated against them because they are transgender women, treating them differently from similarly situated cisgender women without an exceedingly persuasive justification.

### D. Oregon Constitution – Article I, §§ 13 and 16

Article I, section 13 of the Oregon Constitution provides that "[n]o person arrested, or confined in jail, shall be treated with unnecessary rigor." The Oregon Supreme Court has held that this provision is "directly addressed to prison practices" and "confine[s] 'rigorous' treatment to prisoners within constitutional bounds of necessity." *Sterling v. Cupp*, 290 Or. 611, 617, 619, 625 P.2d 123 (1981). Section 13 is "a more cogent premise" for analyzing prison-conditions claims than federal privacy or Eighth Amendment doctrine because it "makes necessity the test

of the practices it controls" and is expressly directed to the treatment of people in custody. *Id*. at 619–20. Although section 13 speaks in terms of persons "arrested, or confined in jail," it applies to anyone arrested or confined, including those who have been convicted and are serving prison sentences. *Lawson v. Cain*, 323 Or. App. 730, 737–38, 524 P.3d 529 (2023) (reaffirming that *Sterling* construed section 13 to reach penitentiary inmates); *see also Bedell v. Schiedler*, 307 Or. 562, 570 & n.7, 770 P.2d 909 (1989); *Schafer v. Maass*, 122 Or. App. 518, 521-22, 858 P.2d 474 (1993); *State v. Freudenthaler*, 84 Or. App. 531, 535 n.5, 734 P.2d 894, rev. den., 303 Or. 455 (1987).

*Sterling* established a purely objective framework under Article I, section 13. A plaintiff need only show that a particular police or prison practice (1) constitutes a "cognizable indignity" and (2) "cannot be justified by necessity." 290 Or. at 620, 622–23. The analysis turns on whether the practice is more strict, harsh, or degrading than is necessary to accomplish legitimate custodial purposes; it does not require proof of any particular subjective mental state such as intent to punish or deliberate indifference. *See Id.* at 623, 632 (upholding injunction against cross-gender pat-down searches of male prisoners by female guards without any allegation that the searches were "purposely designed to humiliate"); *Lawson*, 323 Or. App. at 737–38 (rejecting argument that section 13 has a subjective component and reaffirming *Sterling*'s objective test). As *Sterling* explained, what qualifies as a cognizable indignity is "largely a matter of social and individual psychology," and may be apparent from "the purpose of [the practice's] imposition," "the viewpoint of the prisoner," or "the perception of the general public," all of which may evolve over time. 290 Or. at 623.

Oregon appellate courts have repeatedly applied this framework to prison conditions that expose incarcerated people to serious health or safety risks or degrading treatment. In *Bedell*, the

Supreme Court held that an allegation that the prison environment "unnecessarily subjects [the plaintiff] to serious health hazards" stated a cognizable Article I, section 13 claim. 307 Or. at 570 & n.7. In *Schafer*, the Court of Appeals held that a prisoner's allegation that he was being subjected to "ongoing and periodical" assaults by other inmates in the Intensive Management Unit likewise stated a section 13 claim. 122 Or. App. at 522. In *Lawson*, the Court of Appeals affirmed habeas relief where the superintendent's failure to enforce basic COVID-19 precautions created "an unjustifiable risk of a serious health hazard" to medically vulnerable adults in custody, holding that SRCI's COVID-19 response constituted unnecessary rigor even though the trial court found no deliberate indifference under the Eighth Amendment or Article I, section 16. 323 Or. App. at 731–32, 734–38.

Most recently, in *LaSeur v. Miller*, 345 Or. App. 33, 47, 50, 53 (2025), the Court of Appeals reiterated that "the constitutional test is an objective one" and held that, when assessing claims of unnecessary rigor, courts must consider whether "the prison conditions or treatment are more strict, severe, or harsh than the circumstances require," including whether they are "abusive, degrading, or inhumane." No showing of subjective intent, deliberate indifference, or punitive motive is required. Those cases make clear that subjecting a prisoner to an unjustifiable risk of serious harm—whether from disease, environmental hazards, or repeated assaults by other prisoners—can violate Article I, section 13 even when officials' conduct does not meet the federal deliberate-indifference standard.

*Sterling* recognized that some practices impose a particular kind of harm because they affront a person's dignity—for example, opposite-sex searches that expose or touch intimate areas. 290 Or. at 622–23. *LaSeur* explains that courts may still consider whether a practice subjects adults in custody to a "cognizable indignity," especially where governing standards

(such as professional or international norms) emphasize the need to conduct that practice in a way that respects human dignity. 345 Or. App. at 50. But the primary question remains whether the conditions and treatment are more strict, severe, or harsh than necessary, including whether they are abusive, degrading, or inhumane.

Article I, section 16 provides that "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense." The Oregon Supreme Court has applied section 16 both to sentencing proportionality and to prison-conditions claims that amount to punishment. In the sentencing context, the court has articulated a proportionality framework that considers the severity of the penalty in relation to the offense, penalties for related crimes, and the defendant's criminal history. *See, e.g., State v. Rodriguez*, 347 Or. 46, 57–60, 217 P.3d 659 (2009). In the prison-conditions context, the court has held that denial of necessary medical care can constitute cruel and unusual punishment where it amounts to deliberate indifference to serious medical needs, essentially tracking the Eighth Amendment standard. *Billings v. Gates*, 323 Or. 167, 170–73, 916 P.2d 291 (1996) (recognizing that prison officials' deliberate indifference to an inmate's serious medical needs may violate Article I, section 16, but concluding the record there did not establish deliberate indifference). *Lawson* illustrates the distinction: the trial court found that SRCI's COVID-19 practices created an "unnecessarily dangerous environment" that violated contemporary standards of decency, but that the superintendent had not acted with deliberate indifference; the Court of Appeals accordingly affirmed relief under Article I, section 13 while upholding the denial of the Article I, section 16 claim and the Eighth Amendment claim. *Lawson*, 323 Or. App. at 731–32, 734–38.

Article I, sections 13 and 16 provide independent constitutional protections for people in ODOC custody. Section 16 mirrors the Eighth Amendment in prohibiting cruel and unusual

punishments, including deliberate indifference to serious medical needs and other punitive, degrading conditions. Section 13 goes further by prohibiting any prison practices that constitute a cognizable indignity and are more harsh, dangerous, or degrading than necessity allows, without requiring proof of subjective intent. For transgender women in ODOC custody, being forced to live in men's prisons where they face a constant risk of rape and assault, being subjected to cross-gender strip searches and lack of bodily privacy, being subjected to slurs, misgendering, and other degrading language, and being punished or placed in harsh isolation when they seek protection or report abuse are all classic examples of "unnecessary rigor" under *Sterling*, *Bedell*, *Schafer*, and *Lawson*: they are practices that inflict serious indignities and risks that cannot be justified by any legitimate necessity.

### E. PLRA – Narrowly Tailored Prospective Relief

Under the PLRA, "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right," giving "substantial weight" to any adverse impact on public safety or the operation of the criminal justice system. 18 U.S.C. § 3626(a)(1)(A); *see also* 18 U.S.C. § 3626(a)(2) (similar standard for preliminary relief). The Ninth Circuit has held that the PLRA "has not substantially changed the threshold findings and standards required to justify an injunction." *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001)); *see also Hallett v. Morgan*, 296 F.3d 732, 743–44 (9th Cir. 2002). The need–narrowness–intrusiveness findings may be satisfied where the record and court's decision demonstrate that the relief tracks constitutional requirements and institutional policies. *See Gilmore v. California*, 220 F.3d 987, 1007–08 (9th

Cir. 2000); *see also Balla v. Idaho*, 29 F.4th 1019, 1028 (9th Cir. 2022) (burden remains on the state to show relief exceeds constitutional minimum).

Preliminary injunctions in prison cases must also meet these standards and are limited in duration, but courts may enter sequential preliminary injunctions if the factual justification continues. 18 U.S.C. § 3626(a)(2); see PLRA treatise (discussing § 3626(a)(2) and preliminary relief).

## IV.   ARGUMENT

### A.  Plaintiffs Are Likely to Succeed on the Merits

#### 1.  Eighth Amendment – Ongoing Exposure to Sexual Violence and Dangerous Conditions

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates," including a duty to "protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832–33 (quoting *Cortes–Quinones*, 842 F.2d at 558, cert. denied, 488 U.S. 823, and citing *Seiter*, 501 U.S. at 303; *Hudson*, 468 U.S. at 526–27; *Estelle,* 429 U.S. at 102–04; *Rhodes*, 452 U.S. at 347; *Trop*, 356 U.S. at 101). A prisoner states an Eighth Amendment claim where she is incarcerated under conditions posing a substantial risk of serious harm and officials act with "deliberate indifference" to that risk. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 33–35. *Farmer* specifically recognizes that placing a pre-operative transgender woman "who acts in a feminine manner" in the general male population can evidence deliberate indifference to a substantial risk of sexual assault. 511 U.S. at 829, 848–49.

The objective component is easily satisfied here. The record shows that transgender women in ODOC custody are repeatedly raped, coerced into sex, and physically assaulted after ODOC houses them in men's prisons, often with men they explicitly identified as dangerous.

S.D. and J.F. have each been raped and severely beaten by male cellmates and gang members following ODOC's housing decisions; they have been forced to trade sex for protection and subjected to relentless sexual harassment and hate speech because they are transgender. (J.F. Decl. ¶¶ 4–8, 15, 20–21; Dkt. 1, ¶¶ 58-68.) Doe, L.B., and S.S. describe the same pattern: placement with known predators and hostile gangs, repeated rape and beatings, denial of basic post-assault care, and being left in proximity to assailants. (Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.) Courts have long recognized that transgender prisoners are an identifiable group "frequently singled out for violent attack by other inmates," and that proof a prisoner belongs to such a group can establish exposure to a sufficiently serious risk of harm. *Farmer*, 511 U.S. at 843; *see Doe v. Wash. State Dep't of Corr.*, No. 4:21-CV-5059-TOR, 2021 LEXIS 93455, at *26–*27, *33, 2021 WL 2453099, at *4 (E.D. Wash. May 17, 2021) (noting data showing transgender prisoners are sexually assaulted at rates many times higher than other prisoners and collecting cases) (citing *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 696 (S.D. Tex. 2016) (stating "[t]he vulnerability of transgender prisoners to sexual abuse in no secret" and citing a report conducted in 2011 by the Bureau of Justice Statistics that found "34.6% of transgender inmates reported being the victim of sexual assault," which was "nearly nine times the rate for all prisoners"); *see also Doe v. D.C.*, 215 F. Supp. 3d 62, 75 (D.D.C. 2016); *Tay v. Dennison*, 457 F. Supp. 3d 657, 684 (S.D. Ill. 2020). Sadly, those statistics are reflected in the Oregon prison system.

The subjective prong is also satisfied. Plaintiffs and other class members repeatedly told ODOC staff they feared specific cellmates, reported explicit threats and prior assaults, requested transfer to safer units or CCCF, and filed grievances and PREA complaints describing their vulnerability and abuse. (J.F. Decl. ¶¶ 4–8, 11–15, 19–21; Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8;

S.S. Decl. ¶¶ 2–7.) Staff acknowledged those dangers—sometimes warning J.F. that she was likely to be assaulted in a particular unit—but proceeded anyway. (J.F. Decl. ¶ 8) PREA officers told victims they would not be believed and instructed them to stop calling the hotline; investigators disclosed confidential complaints to the very staff accused of sexual misconduct; victims were written up, moved to harsher units, or forced into "protective" solitary confinement. (J.F. Decl. ¶¶ 11–13, 19–21; Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8.) Under *Farmer*, knowledge may be inferred where the risk is obvious and repeatedly brought to officials' attention; officials "know of and disregard an excessive risk" when they persist in the same dangerous policies and placements despite clear notice of the harm. 511 U.S. at 837, 842–43.

The ways ODOC treats transgender women also match patterns the Ninth Circuit and other courts have already identified as deliberate indifference. Labeling a prisoner in ways that invite attack—such as calling her a "snitch" or otherwise marking her as a target—states an Eighth Amendment claim. *Valandingham*, 866 F.2d at 1139. Here, officers have openly used anti-transgender slurs and derogatory labels in front of other prisoners, increasing the risk of violence. (J.F. Decl. ¶¶ 20–21; *see also* Dkt. 1, ¶¶ 64-66.) Housing a vulnerable prisoner with known aggressors or in units dominated by groups that target her can likewise constitute deliberate indifference. *See Hearns*, 413 F.3d at 1040 (allegations that officials knew of risk of religiously motivated attacks and facilitated them stated a claim); *Frost*, 152 F.3d at 1129 (placing mobility-impaired prisoner in non-accessible unit despite complaints showed deliberate indifference to safety). ODOC repeatedly assigned transgender women to cells and units with known predators and hostile gangs despite explicit warnings and prior assaults and then left them there even after rapes and severe beatings occurred. (J.F. Decl. ¶¶ 5–7, 16; Doe Decl. ¶¶ 4–10; S.S. Decl. ¶¶ 2–7.)

Federal courts addressing similar systemic risks to transgender prisoners have reached the same conclusion. In *Doe v. Wash. Dep't of Corr.*, the court recognized that transgender prisoners are particularly vulnerable to sexual violence and applied *Farmer*'s framework to hold that exposing them to increased risk based on their transgender status can satisfy the objective prong of an Eighth Amendment claim. 2021 LEXIS 93455, at \*14-\*16, \*26–\*27.

In *Goff v. Arizona*, 526 F. Supp. 3d 551, 567–68 (D. Ariz. 2020), the court described how a transgender woman housed only in male facilities for decades experienced repeated rapes, forced oral sex, and beatings while the prison's birth-sex housing policy and failures of its transgender committee left her at "everyday" risk of violence. And in *Unique v. Claybaugh*, 712 F. Supp. 3d 1265, 1273–76 (N.D. Cal. 2024), the court held that transgender prisoners plausibly alleged Eighth Amendment failure-to-protect claims where officials placed them in dormitory housing despite their known vulnerable status and history of sexual assault, and where the state systematically failed to follow federal regulations requiring safe housing for vulnerable inmates. Those cases underscore what the facts here already show: continuing to house transgender women in men's prisons and dangerous open units, despite clear notice of their vulnerability and repeated assaults, is deliberate indifference.

ODOC's failure to implement basic PREA-compliant measures further confirms that deliberate indifference. PREA and ODOC Policy 40.1.13 require case-by-case housing determinations that consider a transgender woman's own views of her safety and mandate opportunities to shower separately from others. *See* Or. Dep't of Corr., DOC Policy 40.1.13, Prison Rape Elimination Act (effective Mar. 1, 2025). In practice, ODOC instead applies a blanket rule: transgender women are classified as "male," housed in men's prisons dominated by gangs that target them, subjected to cross-gender strip searches and forced exposure of their nude

bodies to male prisoners and staff, and told their only alternative to general population is punitive isolation that strips them of programming and human contact. (J.F. Decl. ¶¶ 4–10, 14–15, 17–21; L.B. Decl. ¶¶ 3–8.) The Ninth Circuit has held that policies imposing cross-gender searches or intrusive touching on a vulnerable population can violate the Eighth Amendment even where physical contact is clothed and ostensibly "routine." *See Jordan v. Gardner*, 986 F.2d 1521, 1524–31 (9th Cir. 1993) (en banc) (upholding injunction against policy requiring male officers to conduct random clothed body searches of women prisoners because of the severe psychological trauma it inflicted). ODOC's insistence on cross-gender strip searches of legally female transgender women and its refusal to provide basic bodily privacy are even more extreme.

Finally, the pattern here is squarely in line with other prison-conditions cases where courts have granted or upheld preliminary relief on Eighth Amendment claims. In *Laube v. Haley*, the district court granted class-wide preliminary injunctive relief to women incarcerated at an overcrowded, understaffed prison where open-dorm housing and inadequate supervision created an unacceptably high risk of sexual assault and physical harm, concluding that the threat of violence outweighed any administrative burden on prison officials. 234 F. Supp. 2d 1227, 1232–36, 1252–53 (M.D. Ala. 2002). More recently, in *Cal. Coalition for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 728–32, 747 (N.D. Cal. 2024), the court granted a preliminary injunction where women prisoners faced imminent risk of sexual abuse and serious medical neglect due to chronic understaffing, finding that the ongoing risk of harm satisfied both the likelihood-of-success and irreparable harm requirements. The conditions faced by Plaintiffs here—constant risk of rape and violent assault, blatant disregard of PREA, and punitive responses to requests for protection—are at least as alarming as those in *Laube* and *Cal.*

*Coalition*. On this record, Plaintiffs have more than shown a likelihood of success on their Eighth Amendment claim.

## 2. Equal Protection – Discrimination Against Transgender Women

Plaintiffs also demonstrate a strong likelihood of success on their Equal Protection claim. ODOC categorically houses transgender women in men's prisons based on genitalia or birth sex while providing cisgender women safe housing at CCCF and gender-affirming conditions consistent with their gender identity. (J.F. Decl. ¶¶ 1–3; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.) Transgender women who are legally recognized as female—like S.D. and J.F.—are nonetheless excluded from CCCF and other gender-affirming placements and forced into male facilities where they face grave risks of assault and harassment. (J.F. Decl. ¶¶ 1–3, 5, 11-14; Dkt. 1, ¶¶ 58-60.)

Under the Equal Protection Clause, state policies that classify based on sex are subject to at least intermediate scrutiny, and discrimination against transgender people is a form of sex discrimination subject to heightened scrutiny. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1227–31 (9th Cir. 2020) (recognizing that discrimination against transgender individuals implicates sex-based classifications and upholding a policy that protected, rather than burdened, transgender students); *Karnoski v. Trump*, 926 F.3d 1180, 1200–02 (9th Cir. 2019) (plurality) (explaining that policies targeting transgender people are subject to heightened scrutiny); *see also Bostock,* 590 U.S. at 658–59 (holding that discrimination against transgender persons is discrimination "because of sex" under Title VII). Other federal courts have applied the same principle in correctional settings, recognizing that policies singling out transgender prisoners for worse treatment or denying them gender-affirming conditions raise serious equal-protection concerns. *See, e.g., Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119–21 (N.D. Cal. 2015) (finding a

likelihood of success on equal-protection and Eighth Amendment claims where California refused medically necessary treatment for a transgender woman prisoner while providing comparable care to cisgender prisoners); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 771–75, 803 (9th Cir. 2019) (recognizing that denying gender-affirming care to a transgender woman in custody, in the face of clear medical need, violated the Eighth Amendment); *Doe v. Wash. Dep't of Corr.*, No. 4:21-cv-05059, 2021 LEXIS 93455, at \*42–\*43 (E.D. Wash. May 17, 2021) (granting preliminary relief and later approving class-wide settlement to protect transgender, nonbinary, and intersex prisoners from disclosure of their identity and resulting harm); *Sassman v. Brown*, 99 F. Supp. 3d 1223, 1234–35 (E.D. Cal. 2015) (applying heightened scrutiny to a corrections policy that treated similarly situated prisoners differently based on sex).

Here, ODOC's discrimination is both formal and functional. Formally, ODOC treats transgender women as "male" for classification and housing purposes, notwithstanding their legal sex and gender identity, while treating cisgender women as women and housing them accordingly. (J.F. Decl. ¶¶ 1–3.) Functionally, ODOC denies transgender women access to CCCF or other women's housing, refuses to create non-punitive, gender-affirming alternatives, and instead confines them to men's facilities where they are exposed to rape, sexual coercion, and constant harassment. (J.F. Decl. ¶¶ 2, 5, 11-14, 20; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.) ODOC already operates specialized housing and programs for other vulnerable groups—such as youth, elderly adults in custody, and people with serious mental illness—but refuses comparable protections for transgender women, despite clear evidence that they are at extreme risk of serious harm. (J.F. Decl. ¶¶ 2–3.)

Under heightened scrutiny, ODOC must show an "exceedingly persuasive justification" for treating transgender women differently from similarly situated cisgender women. *See*

*Karnoski*, 926 F.3d at 1200–02 (plurality); *Parents for Privacy*, 949 F.3d at 1227–31. Generalized invocations of "security," discomfort of staff or other prisoners, or administrative convenience are not enough—particularly where less discriminatory alternatives exist and are already contemplated by ODOC's own PREA policy. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 613-15 (4th Cir. 2020) (holding that exclusion of a transgender boy from boys' restrooms violated equal protection where asserted privacy and safety concerns were speculative and could be addressed by less restrictive means); *cf. Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812–16 (11th Cir. 2022) (Pryor, C.J., dissenting). ODOC could, consistent with PREA and its own policies, conduct individualized assessments, presumptively place transgender women in housing consistent with their gender identity absent a documented security reason, and create safe, non-punitive alternatives when CCCF placement is not feasible. Its refusal to adopt those less restrictive, gender-affirming measures—while persistently subjecting transgender women to conditions that ODOC knows are extraordinarily dangerous—strongly suggests that the current policy is driven by sex-based and transgender-based bias and by institutional convenience, not by any legitimate, important governmental interest.

Because ODOC cannot offer an exceedingly persuasive justification for categorically excluding transgender women from women's housing and safe, gender-affirming conditions, Plaintiffs are likely to succeed on their Equal Protection claim.

### 3. Oregon Constitution – Cruel and Unusual Punishment and Unnecessary Rigor

The same facts that establish Eighth Amendment violations support Plaintiffs' claims under Article I, §§ 13 and 16 of the Oregon Constitution. Plaintiffs and class members are subjected to conditions that are dangerous, degrading, and far more severe than necessary to

accomplish any legitimate penological objective: repeated rape and sexual assault, forced exposure of their nude bodies to male inmates and staff, lack of bodily privacy in cells and showers, deliberate housing with hostile gangs and known predators, and punitive use of solitary confinement or harsh suicide-watch cells in response to reports of abuse or suicide attempts. (J.F. Decl. ¶¶ 2, 5-8, 9, 11-15; Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.) Those are precisely the kinds of "cognizable indignit[ies]" and unjustifiable risks that Article I, § 13 forbids. *See Sterling v. Cupp*, 290 Or. 611, 617–23, 625 P.2d 123 (1981) (section 13 is "directly addressed to prison practices" and prohibits practices that would be recognized as an abuse and cannot be justified by necessity); *Bedell*, 307 Or. at 570 & n.7, 770 P.2d 909 (allegations that prison "unnecessarily subjects [plaintiff] to serious health hazards" stated an Article I, § 13 claim); *Schafer v. Maass*, 122 Or. App. 518, 522, 858 P.2d 474 (1993) (allegations of "ongoing and periodical" assaults by other inmates in intensive unit stated an Article I, § 13 claim). As *Lawson*, *supra*, confirms, the section 13 inquiry is purely objective: the question is whether ODOC's practices constitute unnecessary rigor by exposing medically or otherwise vulnerable AICs to unjustifiable risks of serious harm, not whether particular officials acted with deliberate indifference. 323 Or. App. at 737–38 (upholding habeas relief where COVID-19 practices created "an unjustifiable risk of a serious health hazard" to medically vulnerable AICs under § 13 even though deliberate indifference was not proved under § 16 and the Eighth Amendment).

Those same facts also support relief under Article I, § 16's prohibition on cruel and unusual punishment. Repeatedly subjecting transgender women to rape, physical assault, and extreme psychological trauma, while knowingly maintaining policies that house them with known predators and gangs and retaliate when they seek protection, is punishment in every meaningful sense, untethered to any legitimate penological objective and grossly out of

proportion to any lawful sentence. *See Billings*, 323 Or. at 170–73, 916 P.2d 291 (recognizing that prison officials deliberate indifference to an inmate's serious medical needs can constitute cruel and unusual punishment under Article I, § 16). Here, ODOC could, with modest effort, implement individualized, PREA-compliant housing and safety measures for transgender women without compromising security or operational needs. Its persistent refusal to do so, despite clear notice of the ongoing rapes, assaults, and degradation suffered by Plaintiffs and other class members, violates both Article I, § 13's ban on unnecessary rigor and Article I, § 16's prohibition on cruel and unusual punishment.

### B. Plaintiffs Face Ongoing and Irreparable Harm

Irreparable harm is established where plaintiffs face an ongoing risk of serious physical injury, sexual assault, or violation of constitutional rights. *Winter*, 555 U.S. at 22. The Ninth Circuit has long recognized that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres*, 695 F.3d at 1002 (quoting *Elrod*, 427 U.S. at 373); *see Rodriguez*, 715 F.3d at 1145.

Here, the harm is not speculative. S.D. and J.F. have already been raped and repeatedly assaulted in ODOC custody and continue to live in fear of further attacks. They remain housed in men's facilities that lack safe housing alternatives and are dominated by the same gangs and predators who have targeted them in the past. (J.F. Decl. ¶¶ 5-6, 21; Dkt. 1, ¶¶ 58-68.) Each day without relief subjects them to a significant risk of additional assaults that could cause lasting physical injury, trauma, or death.

Other class members' experiences confirm that these risks are systemic and ongoing, not random past incidents. Doe was instructed by PREA staff to stop calling the hotline after reporting rape; L.B. was moved into a more dangerous unit after reporting harassment; S.S. was

left near her rapist and denied basic medical care. (Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.) These patterns show that ODOC's response to complaints is to silence victims rather than protect them, increasing the likelihood of future harm. *See Farmer,* 511 U.S. at 845–47 (injunctive relief appropriate where violation is ongoing and officials remain deliberately indifferent).

In addition, Plaintiffs suffer continuing psychological harm and exacerbated gender dysphoria from living in constant fear, being forced to present in male clothing, and being subjected to degrading strip searches and lack of bodily privacy. (J.F. Decl. ¶¶ 9, 20; L.B. Decl. ¶¶ 3–8; Dkt. 1, ¶¶ 65-68.) No later damages award can repair the trauma of additional rapes or suicide attempts precipitated by these conditions. Only prospective relief can prevent further irreparable harm.

Courts in this District repeatedly find irreparable harm where plaintiffs face an immediate risk to their health or safety or the loss of constitutional rights. In *D.W.*, 534 F. Supp. 3d at 1284–85, the court held that a disabled patient who would die without dialysis had established irreparable harm where the defendant refused to provide treatment and granted a TRO ordering continued care. Likewise, in *Doe #1 v. Trump*, 414 F. Supp. 3d 1307, 1318-19 (D. Or. 2019), the court found irreparable harm where federal policy threatened to separate families and prevent reunification, emphasizing that such harms to family integrity and emotional well-being could not be remedied by later damages. The ongoing risk that Plaintiffs will be raped, beaten, or driven to self-harm or suicide by ODOC's housing practices presents at least as acute and irreparable an injury as the harms recognized in *D.W.* and *Doe #1*.

Irreparable harm is particularly clear where the State's conduct endangers bodily integrity, mental health, and core aspects of a person's gender identity. In *Edmo,* the Ninth

Circuit affirmed a permanent injunction requiring a prison system to provide gender confirmation surgery to a transgender woman, holding that the Eighth Amendment is violated where officials are deliberately indifferent to the serious risks of self-harm, suicide, and psychological deterioration that accompany untreated gender dysphoria. 935 F.3d 771–75, 795–96. And in *Parents for Privacy*, 326 F. Supp. 3d 1075, 1102–04 (D. Or. 2018), aff'd, 949 F.3d 1210 (9th Cir. 2020), this Court recognized that policies forcing transgender students to use facilities inconsistent with their gender identity can inflict concrete dignitary and psychological harms that must be taken seriously under federal law.

The harm here is quintessentially irreparable. Transgender women in ODOC custody face ongoing rape, physical assaults, and extreme psychological trauma on a daily basis. (J.F. Decl. ¶¶ 4–21; Doe Decl. ¶¶ 4–10; L.B. Decl. ¶¶ 3–8; S.S. Decl. ¶¶ 2–7.) Courts repeatedly recognize that the risk of serious mental deterioration, self-harm, or death in custody constitutes irreparable injury supporting injunctive relief. In *Porretti*, the Ninth Circuit upheld an injunction because the record showed the prisoner would suffer "very serious or extreme damage to his mental health" without adequate treatment. *Id.* at 1046–48. In *Porter v. Clarke*, the district court found that prolonged isolation of death-row prisoners "created, at the least, a significant risk of substantial psychological or emotional harm" and entered injunctive relief to prevent the return of those conditions. 290 F. Supp. 3d 518, 532–33 (E.D. Va. 2018), aff'd, 923 F.3d 348 (4th Cir. 2019). Federal courts have likewise granted TROs and preliminary injunctions where systemic conditions expose incarcerated people to serious health risks, such as COVID-19, even before widespread physical injury has occurred. *See Banks v. Booth*, 459 F. Supp. 3d 143, 149–59 (D.D.C. 2020); *Valentine v. Collier*, 455 F. Supp. 3d 308, 320–23 (S.D. Tex. 2020).

District courts have repeatedly found similar irreparable harm where delays or denials of medically necessary care risk serious deterioration or death. *See, e.g., Farnam v. Walker*, 593 F. Supp. 2d 1000, 1014–17 (C.D. Ill. 2009) (granting injunctive relief to prevent further damage to prisoner's health); *Beck v. Hurwitz*, 380 F. Supp. 3d 479, 484–86 (M.D.N.C. 2019) (issuing TRO requiring adequate treatment for prisoner with breast cancer facing risk of metastasis and death).

The risk that class members here will be raped, beaten, driven to self-harm, or suffer further psychiatric decompensation while ODOC continues to house them in men's prisons is at least as grave, and cannot be remedied by post-hoc damages.

### C. The Balance of Equities Tips Sharply in Plaintiffs' Favor

The balance of equities overwhelmingly favors Plaintiffs. On one side are Plaintiffs' lives, bodily integrity, mental health, and constitutional rights. On the other side are Defendants' asserted interests in administrative convenience and preserving the status quo of housing designations that have already been shown to fail.

The relief Plaintiffs seek does not require the Court to micro-manage ODOC operations. It requires ODOC to do what its own policies already demand: conduct individualized housing assessments, give serious consideration to transgender women's safety, provide separate showers and bodily privacy, and avoid using punitive isolation as the default "protective" measure. These steps align with national standards and ODOC's own written policy; they are not extraordinary impositions.

By contrast, denying relief exposes Plaintiffs to continued rapes, assaults, retaliation, and psychological deterioration. Courts have repeatedly held that where an injunction is necessary to prevent serious physical injury or death, the balance of hardships tips sharply toward plaintiffs. *See, e.g., D.W.*, *supra* at 1289 (granting TRO where plaintiff faced risk of death without court

intervention); *Maney v. Brown*, 516 F. Supp. 3d 1161, 1183–85 (D. Or. Feb. 2, 2021) (holding that the balance of hardships favored ODOC prisoners facing increased risk of severe illness or death from COVID-19 and entering classwide preliminary injunction). That is especially true where the requested relief largely tracks the defendant's own written standards and can be implemented with reasonable flexibility.

### D. The Public Interest Strongly Supports Injunctive Relief

The public has a compelling interest in ensuring that people in state custody are not subjected to sexual assault, brutality, or discriminatory treatment at the hands of those charged with their care. Enforcing constitutional guarantees in prisons protects not only the rights of incarcerated people but also the integrity of the justice system and public confidence in state institutions.

The PLRA itself recognizes that courts must balance public safety and operational concerns when entering relief, but it does not authorize prison officials to violate fundamental rights in the name of convenience. *See Gomez*, 255 F.3d at 1129; *Gilmore*, 220 F.3d at 1007–08; 18 U.S.C. § 3626(a)(1)–(2). Here, the requested relief—individualized assessments, safe housing alternatives, staff training, and immediate protection for those who report abuse—will improve institutional safety by reducing sexual violence, suicidality, and retaliatory misconduct. It serves, rather than undermines, the public interest.

In weighing the balance of equities and public interest, this Court has emphasized that protecting the constitutional rights and health of people in custody is itself a compelling public interest. In *Maney*, which involved Eighth Amendment claims related to ODOC's COVID-19 vaccine rollout, the court acknowledged the State's operational and public-safety concerns but concluded that "the public has a strong interest in the provision of constitutionally adequate

medical care to inmates" and that narrowly tailored relief furthered, rather than undermined, public safety. 516 F. Supp. 3d at 1190–92. The same is true here: requiring ODOC to implement basic PREA-compliant, gender-affirming housing and safety measures for transgender women will reduce sexual violence, retaliatory misconduct, and self-harm, thereby improving institutional security and serving the public interest.

The balance of equities and the public interest likewise favor an injunction. The Ninth Circuit in *Porretti* held that the prisoner's "severe and persistent psychotic symptoms overwhelmingly outweighed [the] financial or logistical burdens" of providing appropriate medication, and that an injunction was in the public interest because prisons "must comply with the standard of care mandated by the Eighth Amendment." 11 F.4th at 1047–48. In *Laube*, the court found that the threat of physical and sexual harm to women incarcerated in an overcrowded and understaffed prison outweighed any administrative burden on state officials to implement immediate safety measures, emphasizing that the public has no legitimate interest in the continued operation of an unconstitutionally dangerous facility. 234 F. Supp. 2d at 1252–53. Similarly, courts addressing COVID-19 in prisons have recognized that requiring prisons to adopt reasonable, evidence-based protective measures serves both the public interest in constitutional compliance and broader public-health interests. *Banks*, 459 F. Supp. 3d at 155–59; *Valentine*, 455 F. Supp. 3d at 320–23. Here, the requested relief—individualized, PREA-compliant housing and basic safety measures for transgender women—requires far less intrusion into prison administration than the systemwide remedies approved in those cases, and directly serves the public interest in ensuring that state prisons do not function as sites of ongoing sexual violence and torture for a disfavored group.

### E. The Requested Relief Complies with the PLRA

The Prison Litigation Reform Act requires that any injunctive relief in a prison-conditions case be "narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right," and that courts give "substantial weight" to any adverse impact on public safety or prison operations. 18 U.S.C. § 3626(a)(1)(A), (a)(2). As courts have repeatedly recognized, § 3626 does not displace traditional equitable standards for injunctive relief; instead, it codifies the familiar need–narrowness–intrusiveness framework and adds findings that must accompany any ongoing prospective relief. *See, e.g., Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 962–63 (E.D. Cal. 2009) (three-judge court) (explaining that § 3626(a)(1)(A) largely codifies preexisting injunction standards); *Gilmore*, 220 F.3d at 999–1000; *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) (PLRA does not fundamentally alter injunction standards but limits relief to what is necessary to cure violations).

Plaintiffs' requested interim relief fits comfortably within those limits. They seek an order requiring ODOC, for Plaintiffs and the putative class, to implement a set of protections that directly address the unsafe conditions described in the declarations without dictating day-to-day micromanagement. Specifically, Plaintiffs ask the Court to require ODOC to:

- Immediately end the categorical housing of transgender women in men's facilities without individualized safety assessments and instead conduct prompt, case-by-case housing and classification reviews for all transgender women in ODOC custody, with a presumption of placement consistent with each woman's gender identity absent a documented and articulable security justification;

- Provide safe, non-punitive housing options for transgender women, including (as appropriate) transfer to CCCF, voluntary transgender or gender non-conforming housing units within existing facilities, or other protective placements that do not involve involuntary segregation or loss of programming solely because of transgender status;

- Prohibit housing transgender women with cellmates known to have a history of sexual or serious physical violence unless the transgender prisoner gives informed, voluntary consent after a meaningful review of options;

- Ensure that transgender women have access to separate showers or shower schedules that provide reasonable bodily privacy from male prisoners and staff, and implement policies to prevent forced exposure of nude bodies to male inmates;

- Require that unclothed searches of transgender women be conducted by female staff absent extraordinary, documented circumstances and prohibit cross-gender strip searches otherwise;

- Implement immediate, confidential, and non-retaliatory reporting mechanisms for sexual abuse, harassment, and threats, including effective PREA-compliant hotline access and prompt, good-faith investigations of all such reports with measures to protect reporters from retaliation; and

- Provide interim mental health support, including crisis counseling, for transgender women who report sexual abuse or exhibit suicidality related to unsafe housing or retaliation.

These measures closely track ODOC's existing PREA obligations and national correctional standards, while leaving ODOC broad discretion over staffing, bed space management, and facility-specific implementation.

Federal courts applying § 3626 have routinely approved similarly targeted, group-specific relief where a vulnerable subset of prisoners faces ongoing constitutional harm. In *Edmo,* the Ninth Circuit upheld an injunction requiring the Idaho Department of Correction to provide gender-confirmation surgery to a transgender woman in custody after the district court made explicit need–narrowness–intrusiveness findings, limited the remedy to "actions reasonably necessary" to correct the Eighth Amendment violation, and found no adverse impact on public safety or prison operations. 935 F.3d at 782–84, 800. Likewise, in *Norsworthy v. Beard*, the court granted a preliminary injunction compelling California officials to provide sex reassignment

surgery, holding that the order was narrowly drawn, extended no further than necessary to correct the violation, and was the least intrusive means to do so, with no evidence of adverse impact on safety or operations. 87 F. Supp. 3d 1164, 1194–96 (N.D. Cal. 2015).

More recently, in *Robinson v. Labrador*, the District of Idaho enjoined enforcement of a statute cutting off hormone therapy for incarcerated transgender women, finding irreparable harm and emphasizing that continued compliance with the department's own preexisting medical policy imposed no meaningful burden on the state and satisfied the PLRA's limits. 747 F. Supp. 3d 1331, 1342–48 (D. Idaho 2024). Those cases confirm that tailored relief protecting transgender prisoners from serious, ongoing harm is fully consistent with § 3626 when it is limited to what is medically and constitutionally necessary and leaves implementation details to corrections officials.

The PLRA also accommodates structural or policy-level orders where systemic practices are the source of the violation, so long as the court's relief is cabined to the proven harms. In *Brown v. Plata*, the Supreme Court affirmed a population-reduction order in California's prison system as a necessary and narrowly tailored response to systemic Eighth Amendment violations, emphasizing that the order left the choice of compliance methods to state officials and that § 3626 permits broad remedies when narrower alternatives have failed. 563 U.S. 493, 526–32, 542–43 (2011). The Ninth Circuit has likewise sustained PLRA-compliant remedial orders that reshape prison practices at the policy level where staff culture or systemic deficiencies drive persistent violations, so long as the remedy remains focused on the affected class. *See Armstrong v. Newsom*, 58 F.4th 1283, 1293–1300 (9th Cir. 2023) (upholding remedial measures targeted at widespread abuse of disabled prisoners and concluding they satisfied narrowness and class-focus requirements); *Armstrong v. Brown*, 768 F.3d 975, 986–88 (9th Cir. 2014) (recognizing that in

long-running prison litigation, the district court has substantial discretion to order broader relief when narrower measures have failed to cure violations). Plaintiffs' requested injunction falls well within this line of authority: it alters ODOC's classification and housing practices only to the extent necessary to stop the ongoing Eighth Amendment and equal-protection violations against transgender women, while leaving ODOC free to decide how best to configure specific units, assign staff, and manage operations.

Section 3626 expressly addresses preliminary relief. Preliminary injunctions in prison-conditions cases must meet both Winter's requirements and the PLRA's need–narrowness–intrusiveness standard, and they automatically expire after 90 days unless the court makes the findings required for prospective relief and converts the order into ongoing relief under § 3626(a)(1)(A). 18 U.S.C. § 3626(a)(2). Applying these provisions in a COVID-19 class action brought by ODOC prisoners, this Court held that the PLRA "has not substantially changed the threshold findings and standards required to justify an injunction," but requires specific findings that the ordered relief is narrowly drawn, no broader than necessary, and the least intrusive means of remedying the violation. *Maney v. Brown*, 516 F. Supp. 3d 1161, 1190–91 (D. Or. 2021) (internal quotation marks omitted). The Ninth Circuit has similarly emphasized that preliminary relief under § 3626(a)(2) expires by operation of law after 90 days if it is not converted to final prospective relief with the requisite findings. *See Ahlman v. Barnes*, 20 F.4th 489, 493–94 (9th Cir. 2021). Consistent with *Maney* and *Ahlman*, Plaintiffs ask the Court to enter preliminary relief that is tightly focused on ending the dangerous housing, search, and reporting practices that subject transgender women to ongoing risk of rape, assault, and suicide, and then—once a fuller record is developed—to make § 3626(a)(1)(A) findings so that appropriate, classwide protections can be maintained.

Finally, the requested order expressly preserves ODOC's institutional flexibility. The relief Plaintiffs seek sets constitutional guardrails—ending categorical placement of transgender women in men's prisons; requiring individualized, gender-affirming housing and classification decisions; prohibiting cross-gender strip searches absent extraordinary circumstances; ensuring basic bodily privacy; and mandating functional, non-retaliatory mechanisms to report and respond to sexual abuse—while leaving it to ODOC to propose and implement concrete compliance plans at each institution. That is precisely the kind of minimally intrusive, policy-level relief the PLRA contemplates: one that corrects the proven violations with the least interference in prison administration consistent with the Constitution. *See* 18 U.S.C. § 3626(a)(1)(A); *Plata*, 563 U.S. at 538–43; *Armstrong*, 58 F.4th at 1293–96.

### F.  Class Certification Under Fed. R. Civ. P. 23(b)(2)

Plaintiffs bring this case as a putative class action under Rule 23(a) and 23(b)(2) on behalf of "all current and future transgender women in ODOC custody." Systemic challenges to prison policies and practices that create a substantial risk of serious harm to a defined group of prisoners are paradigmatic Rule 23(b)(2) cases, because a single injunction or declaratory judgment can provide relief to each class member. *See Parsons v. Ryan*, 754 F.3d 657, 686–87 (9th Cir. 2014). The court in *Parsons* went on to note

> The district court concluded that the plaintiffs' claims "for injunctive relief stemming from allegedly unconstitutional conditions of confinement are the quintessential type of claims that Rule 23(b)(2) was meant to address." It explained that "the claims of systemic deficiencies in ADC's health care system and unconstitutional conditions of confinement in isolation units apply to all proposed class members," and firmly rejected the defendants' contention that "any proposed injunction here would be crafted at a stratospheric level of abstraction." It added that "the remedy in this case would not lie in providing specific care to specific inmates," but rather "the level of care and resources would be raised for all inmates." "Thus," it concluded, "if successful, a proposed

> injunction addressing those [policies and] practices would ...
> prescribe a standard of conduct applicable to all class members."
> In other words, "relief for some inmates would necessarily result in
> injunctive relief for all inmates."

*Parsons*, 754 F.3d at 687. The requirements of Rule 23 are easily satisfied here.

Rule 23(a)(1) is met because joinder of all current and future transgender women in ODOC custody is plainly impracticable. Transgender women are incarcerated throughout multiple ODOC facilities, and the class by definition includes future prisoners whose identities are presently unknown. In *Parsons*, the Ninth Circuit held that a class of more than 30,000 Arizona prisoners challenging statewide medical and mental-health policies easily satisfied numerosity; the smaller but dispersed and fluid population of transgender women in ODOC custody likewise meets this standard. See *id.* at 674–75.

Rule 23(a)(2)'s commonality requirement is also satisfied. The common questions here turn on Defendants' uniform policies and practices, not on any one woman's individual circumstances. Those questions include whether ODOC's categorical housing of transgender women in men's prisons, its refusal to conduct constitutionally adequate, PREA-compliant individualized housing assessments, and its failure to provide safe, non-punitive housing alternatives expose class members to a substantial risk of serious harm in violation of the Eighth Amendment and Article I, §§ 13 and 16 of the Oregon Constitution, and whether ODOC's genitalia-based classification and housing policies discriminatorily deny transgender women access to gender-consistent housing and safety measures in violation of the Equal Protection Clause. As in *Parsons*, the "common contention" is that Defendants' policies and systemic practices place every class member at a substantial risk of serious harm; that is more than sufficient to establish commonality. *See id.* at 676–84.

Rule 23(a)(3) and (4)—typicality and adequacy—are likewise satisfied. The named Plaintiffs' claims are typical of the class because they arise from the same ODOC policies and practices, rely on the same legal theories, and seek the same injunctive relief as all other class members. Like all transgender women in ODOC custody, S.D. and J.F. are subject to ODOC's male-facility housing policy, the lack of meaningful individualized safety review, and the failure to provide safe, non-punitive alternatives; they challenge those systemic practices as unconstitutional and seek forward-looking relief. Nothing in the record suggests any conflict between the named Plaintiffs and absent class members, and their counsel are experienced civil-rights and prison-conditions litigators capable of vigorously prosecuting the case on a classwide basis. See *id.* at 685.

Rule 23(b)(2) is satisfied because Defendants have "acted or refused to act on grounds that apply generally to the class," making "final injunctive relief or corresponding declaratory relief" appropriate "respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs do not seek individualized damages awards or person-by-person housing orders. They seek classwide declaratory and injunctive relief that will govern ODOC's treatment of all transgender women in its custody by requiring constitutionally adequate, individualized housing and safety assessments; presumptively gender-consistent placement; access to safe, non-punitive alternatives; and implementation of basic PREA and gender-affirming safeguards. This is precisely the type of relief Rule 23(b)(2) is designed to support. *See Parsons*, 754 F.3d at 686–87 (upholding a (b)(2) class challenging systemic prison policies and seeking only injunctive and declaratory relief); *Betschart v. Garrett*, 700 F. Supp. 3d 965, 972–77 (D. Or. 2023) (certifying a Rule 23(b)(2) class of indigent criminal defendants and granting classwide injunctive relief to remedy a systemic constitutional violation).

Because Plaintiffs seek system-wide injunctive relief, certification (or provisional certification) of a Rule 23(b)(2) injunction class is also the proper mechanism to ensure that the scope of any TRO or preliminary injunction is aligned with Rule 65(d). The Ninth Circuit has cautioned that, absent class certification, an injunction ordinarily must be limited to the parties before the court. *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727–28 (9th Cir. 1983). By certifying an injunction class of all current and future transgender women in ODOC custody, the Court can both provide meaningful relief to the entire group subjected to the challenged policies and practices and ensure that any TRO or preliminary injunction is properly framed as classwide relief under Rule 23(b)(2), consistent with Rule 65 and the PLRA.

**G.  Provisional Class Certification at the TRO and Preliminary Injunction Stage**

Because Plaintiffs seek system-wide injunctive relief governing ODOC's treatment of all current and future transgender women in its custody, provisional certification of a Rule 23(b)(2) injunction class in connection with this TRO and preliminary injunction motion is both appropriate and necessary. Courts in this District and across the Ninth Circuit routinely certify, or provisionally certify, injunctive classes at the same time they enter preliminary relief in systemic prison and detention cases.

In *Maney v. Brown*, a systemic Eighth Amendment and PLRA challenge to ODOC's handling of COVID-19 vaccination, the court granted plaintiffs' motion for provisional class certification and their motion for a preliminary injunction in the same order. *See* 516 F. Supp. 3d 1161 (granting provisional Rule 23(b)(2) certification of a "Vaccine Class" of all adults in ODOC custody who had not been offered a COVID-19 vaccine and ordering ODOC to offer vaccination to all class members on a set schedule). The court explained that classwide injunctive relief was necessary to remedy a uniform, system-wide policy and that provisional

certification was appropriate at the preliminary-injunction stage so that relief could extend to all similarly situated prisoners. *Id.* at 1174-75.

Likewise, in *Betschart*, the court considered together petitioners' motions for provisional class certification and a temporary restraining order challenging the systemic denial of counsel to indigent criminal defendants in Oregon. 700 F. Supp. 3d at 972–77. The court granted provisional certification of a Rule 23(b)(2) class of unrepresented indigent defendants and entered a TRO, later converted to a preliminary injunction, requiring that class members be appointed counsel within a specified timeframe or be released. *Id.* at 972–77. *Betschart* confirms that, where the alleged constitutional violation is institutional and the requested remedy is forward-looking and classwide, provisional (b)(2) certification and emergency injunctive relief properly proceed together.

The Ninth Circuit has also recognized the propriety of provisional class certification in prison and jail conditions cases at the preliminary-injunction stage, while emphasizing the PLRA's temporal limits. In *Ahlman v. Barnes*, prisoners in an Orange County jail brought a § 1983 class action challenging the jail's failure to protect them from COVID-19. The district court granted plaintiffs' motion for provisional class certification and contemporaneously issued a preliminary injunction under the PLRA. *Ahlman*, 20 F.4th at 492–94. The Ninth Circuit held that because § 3626(a)(2) provides that any preliminary injunction in a prison-conditions case automatically expires after 90 days unless the district court makes the findings required for prospective relief and converts the order, both the preliminary injunction and the provisional class certification lapsed when the district court did not take those additional steps. *Id.* at 493–94. *Ahlman* thus confirms not only that provisional class certification at the preliminary-injunction stage is proper in PLRA cases, but also that such certification is naturally tied to the life of the

preliminary relief and can be renewed or superseded by final class certification and permanent injunctive relief as the case develops.

These cases, together with *Parsons*, which approved Rule 23(b)(2) certification of a statewide prison-conditions class seeking only injunctive and declaratory relief, confirm that Plaintiffs' request for provisional certification of an injunction class at the TRO and preliminary-injunction stage is the appropriate mechanism for securing system-wide protections for all transgender women in ODOC custody. *See Parsons*, 754 F.3d at 686–87.

Accordingly, consistent with *Maney*, *Betschart*, and *Ahlman*, Plaintiffs ask the Court to provisionally certify a Rule 23(b)(2) class of all current and future transgender women in ODOC custody for purposes of this TRO and preliminary injunction, and, as the record develops, to make the further findings required by 18 U.S.C. § 3626(a)(1)(A) so that appropriate classwide prospective relief can be maintained beyond the PLRA's 90-day preliminary-injunction period.

## V. CONCLUSION

All four *Winter* factors and the PLRA standards are satisfied. Plaintiffs have shown a strong likelihood of success on their Eighth Amendment, Equal Protection, and Oregon constitutional claims; they face ongoing and irreparable harm in the form of sexual assault, physical violence, and serious psychological injury; the balance of equities tips sharply in their favor; and the public interest decisively supports enforcing constitutional protections for transgender women in ODOC custody. The relief sought is narrowly tailored, no more extensive than necessary to correct the violations, and the least intrusive means available.

Plaintiffs therefore respectfully request that the Court provisionally certify, under Rule 23(b)(2), a class of all current and future transgender women in ODOC custody for purposes of this motion; issue a Temporary Restraining Order, effective immediately and without bond or

upon a nominal bond, directing Defendants to implement the interim protections outlined above for Plaintiffs S.D. and J.F. and similarly situated transgender women in ODOC custody; set this matter for a prompt hearing on a Preliminary Injunction and, after that hearing, convert the TRO into a Preliminary Injunction that remains in effect during the pendency of this litigation, subject to the PLRA's time limits and renewal provisions; order Defendants to submit, within a timeframe set by the Court, a plan describing how they will implement the required protections in compliance with PREA, ODOC Policy 40.1.13, and constitutional standards, and allow Plaintiffs an opportunity to respond; and grant such other and further relief as the Court deems just and proper to protect Plaintiffs' constitutional rights and prevent further irreparable harm.

Dated: December 23, 2025.

**SNYDER, POST & BURGESS**

*/s/ John Burgess*
John Burgess, OSB No. 106498
johnburgess@civilrightsoregon.com
Carl Post, OSB No. 061058
carlpost@civilrightsoregon.com
Tel: (503) 241-3617 / Fax: (503) 241-2249

Abby Greenfield, OSB No. 243463
abby@kedwards-law.com
LAW OFFICE OF KATHARINE EDWARDS
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 664-0645
Attorneys for Plaintiff