UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **S.D.** and **J.F.**, individually and on behalf of all others similarly situated, | Case No. 6:25-cv-01726-CL |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **MIKE REES; RYAN LEGORE; JEREMY WAGNER; MARK NOOTH; AARON REYES; JOHN DOES 1–5; and STATE OF OREGON**, by and through the Oregon Department of Corrections, | |
| Defendants. | |

**CLARKE,** United States Magistrate Judge.

Plaintiffs S.D. and J.F., individually and on behalf of a putative class of all current and future transgender women in Oregon Department of Corrections ("ODOC") custody, move this Court for a Temporary Restraining Order and Preliminary Injunction under Fed. R. Civ. P. 65, as well as Provisional Class Certification under Fed. R. Civ. P. 23. Full consent to magistrate jurisdiction was entered on December 30, 2025 (ECF #24). On March 17, 2026, the Court heard oral argument. For the reasons below, Plaintiffs' Motion for a Preliminary Injunction and Provisional Certification of the Class (ECF #15) is GRANTED.

## INTRODUCTION

This case is brought by Plaintiffs, S.D. and J.F., individually and on behalf of a putative class of all current and future transgender women in Oregon Department of Corrections ("ODOC") custody. Plaintiffs assert that ODOC has failed to protect transgender women in its

Page 1 — OPINION AND ORDER

custody from sexual and physical violence, and the threat of such violence, and Plaintiffs attribute this failure to ODOC's practice of housing transgender women in men's prisons under conditions that are dangerous, degrading, and inconsistent with their legal gender.

Plaintiffs bring their claims under the Eighth Amendment, the Equal Protection Clause, and the Oregon Constitution's prohibition of cruel and unusual punishment and unnecessary rigor. Complicating the Court's evaluation of these claims are ODOC's policies, and the Prison Rape Elimination Act ("PREA"), which require certain measures to be taken to protect inmates. The PREA does not create a private cause of action, but many of the remedies requested by Plaintiffs fall within the purview of the PREA. The Prison Litigation Reform Act ("PLRA") also mandates that the Court make specific findings before granting any prospective injunctive relief concerning prison conditions. Finally, Plaintiffs move to provisionally certify a Rule 23(b) class for purposes of obtaining preliminary relief on behalf of the entire class.

The prospective injunctive relief requested by Plaintiffs in this case is, at first blush, a sweeping overhaul of the Oregon prison system's current housing process for transgender inmates. A deeper look, however, reveals that the requested relief is very nearly the same system that ODOC purports to use already. Currently, ODOC policies require an individualized assessment of each inmate's safety and housing needs, their status as a vulnerable or potentially aggressive adult in custody ("AIC"), their preferred housing placement, and a number of other factors. This current system of individualized assessments, however, appears to begin with a default presumption: that transgender women – AICs who have female gender markers, are legally female, and female-presenting – should generally be housed in men's prison facilities, with very rare exceptions. Thus, regardless of the individualized assessments that ODOC purports to conduct, more than 90% of transgender women are housed in men's facilities. It is

Page 2 — OPINION AND ORDER

undisputed in the record before the Court that this default presumption, and their overwhelming placement in men's prisons, has exposed transgender women inmates to a high risk of violence and sexual assault. The undisputed facts additionally show that ODOC has systemically failed to appropriately address this exposure. This violates the Eighth Amendment, as well as the Equal Protection Clause.

Prospective injunctive relief is necessary to correct these violations. The Defendants, ODOC, and the State of Oregon have a legal obligation to immediately do better to protect transgender inmates, a very vulnerable population. The Court appreciates the complexities of running a safe correctional system for all inmates and knows this Preliminary Injunction will require thoughtful, creative, and compassionate changes. However, the class-wide relief ordered here is narrowly drawn and "least intrusive" because it does not mandate any specific placement of any specific inmate. It allows for flexibility and individualized assessment, just as the current system purports to do.

The Court will schedule an evidentiary hearing to accept testimony from the parties, witnesses, and experts, to ensure that the relief that is implemented continues to be narrowly tailored and properly tied to the harms of the violations at issue, without being overly burdensome to the Oregon prison system as a whole.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). At the same time, federal courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (quoting *Brown v. Plata*,

563 U.S. 493, 511 (2011)). Nor may federal courts "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.*

To obtain a TRO or preliminary injunction, Plaintiffs must show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Additionally, the "already high standard for granting a TRO or preliminary injunction is further heightened when the type of injunction sought is a 'mandatory injunction.'" *Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156 (D. Or. 2018) (citing *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015)). A plaintiff requesting a "mandatory injunction" must "establish that the law and facts clearly favor her position, not simply that she is likely to succeed." *Id.*

At the preliminary injunction stage, the Court is not required to confine itself to evidence that would be admissible at trial so long as it bears indicia of reliability. *Oregon Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1263 (D. Or. 2022) (citations omitted). However, under Rule 65, an injunction order must "state its terms specifically ... [and] describe in reasonable detail ... the act or acts restrained or required." Fed. R. Civ. P. 65(d).

## BACKGROUND

### I.    The PREA and ODOC policies for AIC housing assignments.

According to declarations submitted by ODOC officials, AICs, including cisgender and transgender women, men, and nonbinary AICs, receive housing assignments after individualized PREA assessments while at the Coffee Creek Intake Center ("Intake" or "CCIC"). Jones Decl. ¶4. A PREA assessment reviews ten factors outlined at 28 C.F.R. § 115.41(d)(1)-(10), including an AIC's gender identity or perceived gender identity, which may result in a PREA designation

of "potentially vulnerable" for sexual victimization, which is noted in their housing file. A PREA assessment also reviews an AIC's criminal conviction history and history of correctional institution violence and may result in a PREA designation of "potentially aggressive," which is also noted in their housing file. An AIC may be considered both "potentially vulnerable" and "potentially aggressive" under PREA.

Once an AIC asserts a transgender identity, the Transgender and Intersex Committee ("TAIC") is notified, and the AIC is added to its housing assignment caseload. Jones Decl. ¶4. If the asserted transgender AIC is a new admit at Intake, the AIC is placed in Intake infirmary housing for approximately one week until the TAIC can gather information to decide a housing placement. *Id*. If the asserted transgender AIC is not a new admit and has already received a housing assignment prior to asserting their transgender identity, they are added to the TAIC caseload and they remain in their current housing assignments until TAIC reviews their case and makes a housing determination, taking the AIC's preference into consideration. *Id*.

ODOC policies require that, when determining appropriate and safe housing for a transgender AIC, TAIC committee members consider: how the AIC self-identifies; the safety of the AIC, other AICs, and staff; observation of the AIC's behaviors; the AIC's medical history; the AIC's mental health status; and any other relevant information. Each housing placement is individualized and determined on a case-by-case basis. Jones Decl. ¶5. Any AICs may request housing at a specific facility, and transgender women AICs may request placement at either Coffee Creek Correctional Facility ("CCCF"), which is a women's prison, or a men's facility, and such requests are reviewed and approved on a case-by-case basis using the aforementioned criteria. Jones Decl. ¶¶4-8.

## II.    Plaintiffs' claims and factual allegations

Plaintiffs allege that, regardless of these policies, ODOC overwhelmingly houses transgender women in men's prisons, which puts them at an unreasonable risk of violence and sexual assault. Plaintiffs also allege that when they do experience violence and sexual assault, as a result of their placement in men's prisons, they are disciplined and retaliated against, instead of being protected from further attack. They submit the following factual allegations and declarations as evidence in support of their claims.

### A.    Plaintiff J.F.

Plaintiff J.F. is a transgender woman who is legally recognized as female. Decl. J.F. at ¶1 (ECF #16). She has been on hormone therapy for several years and is in the process of obtaining gender-affirming surgery. *Id*. She asserts that she has been repeatedly housed with cisgender men, and she has been sexually assaulted by many cellmates while incarcerated. *Id*. at ¶2.

During her first PREA review at Two Rivers Correctional Institute ("Two Rivers") in 2019, an officer questioned why she was not housed at CCCF, noting that she presented as female, and stating that it was unsafe for her to remain at a male facility. *Id*. at ¶3. The officer stated that he would recommend changing her housing placement, but no change was ever offered to her. *Id*.

J.F. states that she has spent long periods in solitary confinement to protect herself from abuse. *Id*. at ¶4. At Two Rivers she had rotating cellmates, all cisgender men. One cellmate seemed kind but became violent and coercive. When she refused to have sex with him, he attacked her while she slept, fracturing her orbital socket. *Id*. She was hospitalized, but she states that, "ODOC effectively punished me for the incident by not properly investigating the incident and treat[ing] it as a mutual fight." *Id*.

J.F. also states that, another time, she was placed in a cell with a known gang member. *Id.* at ¶5. J.F. and the gang member both warned an officer that the placement was unsafe. *Id.* Staff said their only alternative was segregation. *Id.* "After his peers taunted him for living with a trans woman, he became enraged and raped me." *Id.* Despite reporting the incident, J.F. asserts that it was not investigated for eight months, and nothing came of the investigation. *Id.*

J.F. states that ODOC staff have repeatedly disclosed her PREA reports to the inmates that she made reports about: "After I filed a complaint against one gang member, staff told him I had reported him, leaving me exposed to retaliation. He later assaulted me, and I was again punished instead of protected." *Id.* at ¶6.

In December 2023, at Snake River Correctional Institute ("Snake River"), J.F. was housed with an AIC who was "a known sexual predator, who harassed me and demanded sex." *Id.* at ¶7. J.F. reported this, but no investigation occurred, and she was left in the cell with him. *Id.* Later, Snake River staff told J.F. that she would be moved to a unit where she was "likely to be assaulted." *Id.* at ¶8. After hearing this, J.F. became distraught and attempted suicide by cutting an artery in her leg. *Id.* She lost consciousness and required emergency hospitalization. Upon returning, she states that "staff placed me on suicide watch in a filthy, unheated cell with urine on the floor." *Id.* In that cell, she had no privacy when using the toilet or changing clothes. *Id.* at ¶9.

An officer at Snake River coerced J.F. and another transgender woman into sexual acts and recorded them on his personal cellphone. *Id.* at ¶10. J.F. states that the investigator assigned to her PREA complaint about this incident found her claims "unsubstantiated," but the officer was later terminated for sexual misconduct with another inmate. *Id.* at ¶11. Around the same time, J.F. reported a Behavior Health Services ("BHS") manager for sexual misconduct. *Id.* at

¶12. The investigator told the BHS manager about the report, and the manager retaliated by transferring J.F. to another prison. *Id.* J.F. offers numerous examples of being attacked and violently assaulted by men in men's prisons, and she states that she was often blamed or disciplined, even when fighting back in self-defense. She also states that she "sometimes provoked altercations to be sent to segregation" as her only means of escape or protection. *Id.* at ¶15. She did this, for instance, at Snake River, when she was "repeatedly forced to perform sexual acts in the gym for male inmates under threat of violence." *Id.*

J.F. recounts other humiliations, such as being routinely cursed and demeaned, being denied privacy in her cell due to large windows and surprise door openings, exposing her while using the toilet or changing. *Id.* at ¶17. She asserts that privacy screens in the showers are inadequate, allowing men to watch her undress. *Id.* J.F. also does not have access to the feminine items available to women at CCCF, such as cosmetics, hair styling tools, and properly fitting clothing. *Id.* at ¶18. The men's clothing worsens her gender dysphoria and humiliation. Finally, she states that:

> Staff and inmates constantly subject me to harassment and slurs, calling me a "freak" or "faggot" and falsely labeling me a child molester. I am targeted sexually and live under continuous threat. Reporting these incidents only makes me more vulnerable because staff routinely fail to protect me or retaliate for complaining.

*Id.* at ¶19.

According to Defendants, J.F. has been in ODOC custody since May 2008, and she first identified to ODOC as transgender in February 2015. J.F. requested a transfer to CCCF in August of 2021. J.F. is designated by ODOC as a "vulnerable" inmate, but she is not approved to be housed at CCCF due to safety concerns arising out of her criminal conviction, which involved a sex offense against a disabled female victim. Jones Decl. ¶10 (ECF #27).

Page 8 — OPINION AND ORDER

**B.     Plaintiff S.D. [1]**

Plaintiff S.D. is a transgender woman who was in ODOC custody at the time this action was filed. Dkt. 1, ¶58. She has a legal female gender marker under Oregon law and a long-documented history of gender dysphoria, PTSD, suicidality, and vulnerability to sexual violence. *Id.* Despite this, ODOC has repeatedly housed S.D. in general population men's facilities.

S.D.'s history with ODOC includes a prior incarceration during which she was repeatedly sexually assaulted, coerced, harassed, and exploited. *Id.* at ¶59. S.D. claims that, during that prior term, she was sexually abused by an ODOC correctional officer, Reuben Benavidez.[2] S.D. asserts that ODOC was aware of this history of sexual assault, but during her current term of incarceration, she has been housed in a cell with an inmate with a known propensity for sexual violence and assigned to a unit where she faced harassment from staff and inmates alike. Dkt. 1, ¶60. She claims that, when she attempted to report the abuse, she was mocked and told by staff that she needed to "man up" because she was "in a man's prison." *Id.* She was then placed into disciplinary segregation, and she was not offered any trauma counseling or mental health support. *Id.* at ¶61. S.D. claims that, despite meeting multiple "vulnerability" factors outlined in ODOC's own policies—including her gender identity, prior history of victimization, and ongoing mental health diagnoses—S.D. has not been designated as a Vulnerable Inmate. *Id.* at ¶66. She claims that ODOC has refused to conduct a full classification review and continues to house her as if she were a cisgender man. *Id.*

---

[1] Defendants claim that S.D. is no longer incarcerated. She did not provide a declaration in support of Plaintiffs' claims. The Court includes her allegations for purposes of the record but does not give them as much weight as the other facts in the record, as they are not attested to or otherwise verified.

[2] S.D. filed a federal civil rights action based on the sexual abuse and deliberate indifference she experienced during that earlier incarceration. Dkt. 1, ¶62. That lawsuit was resolved by settlement in March 2025. *Id.*

Page 9 — OPINION AND ORDER

### III.    Other Transgender Women's Experiences in ODOC Custody

Plaintiffs submit the following evidence of the experiences of other transgender women in ODOC custody to show that the pattern of housing and treatment is systemic.

### A.    Jane Doe

Jane Doe ("Doe") is a transgender woman who has been on gender-affirming hormones for years and recently underwent vulvoplasty. She has long been legally recognized as female. Doe Decl. ¶¶1, 37 (ECF #19). Since beginning to live openly as a woman, male correctional officers have repeatedly strip-searched her in view of male prisoners and staff, while making transphobic comments and discussing her genitals. *Id.* at ¶¶4–5. Around October 2020, Doe was assaulted in the dayroom by another AIC. *Id.* at ¶6. She claims that he punched her in the mouth and back while staff stood by and failed to intervene. *Id.* In the months that followed, Doe repeatedly requested transfer to CCCF, explaining that, as a woman in a men's prison, she could not be kept safe, but her requests were denied. *Id.* at ¶7.

Doe asserts that, from about March 2020 to June 2021, ODOC housed her with a known sexually violent offender who told her he had been sent to segregation for PREA violations involving another transgender woman. *Id.* at ¶8. He repeatedly sexually and physically assaulted her and forced her into a non-consensual "relationship" under threat of harm from other inmates. *Id.* When Doe attempted to report this to the PREA Compliance Manager, she was told that her only alternative was to move to an open cell on mainline and was subsequently told that she would "get over it." *Id.* at ¶9. No formal PREA investigation began until she filed a tort claim notice in July 2021. *Id.* at ¶10.

Doe was later groped and assaulted in the recreation yard by another inmate who had threatened her for months; threats that she claims ODOC staff had repeatedly ignored. *Id.* at ¶11. She was eventually transferred to CCCF, but only briefly. *Id.* at ¶12. She was then returned to a

Page 10 — OPINION AND ORDER

men's prison and placed in segregation. *Id.* at ¶¶12–13. After leaving segregation, ODOC again assigned her to live with a known violent sex offender who immediately began sexually harassing her. *Id.* at 14. She was placed in an active gang unit where gangs enforced a "policy" that transgender prisoners could not use the phones—cutting her off from PREA reporting and her lawyers. *Id.* at¶15.

Although ODOC designates Doe as a "vulnerable inmate," she claims that label has not protected her. From December 24, 2022, through January 12, 2023, her cellmate repeatedly sexually harassed, assaulted, and raped her. *Id.* at ¶16. She claims that she repeatedly told staff that she felt unsafe and described being treated like a sex toy," but her pleas were dismissed. *Id.* at ¶¶16–17. On January 11, 2023, her cellmate raped her; the next day he tried to force her to masturbate him. *Id.* at ¶18. When she begged a correctional officer to move her, she was pressed for "specifics" which she was terrified to give. *Id.* at ¶19. The correctional officer sent her back to the same cell, where she was once again assaulted by her cellmate. *Id.* at ¶¶18–20.

When Doe did report another assault, she told staff that the attacker's bodily fluid was still on her. *Id.* at ¶21. Instead of securing evidence and immediately transporting her to a hospital, she claims that staff told her to change clothes, leave the soiled clothing in the cell, and walk to Security Operations. *Id.* She was not taken for a rape exam for roughly seven hours. *Id.* at ¶22. During that time, she was required to undress in front of male staff, her clothing was not preserved as evidence, and she was made to stand and repeatedly recount what happened while begging to go to a hospital. *Id.* at ¶¶21–22. Her attacker remained in the same institution for approximately eight months, during which time, she feared seeing him at medication line or meals and sometimes she skipped both to avoid him. *Id.* at ¶23. He was transferred only after

Page 11 — OPINION AND ORDER

hearings began on her request for a temporary restraining order, and ODOC did not restrict his ability to send her mail until weeks later. *Id.* at ¶¶23–24.

In August 2023, another inmate repeatedly punched the back of Doe's head in the medication line until she lost consciousness; staff pepper-sprayed the other inmate but then handcuffed Doe next to her own vomit, treated her as the perpetrator, and placed her in disciplinary segregation. *Id.* at ¶¶25–26. Male staff made her remove her shirt so they could photograph her injuries. *Id.* Her cell during this period was directly in front of areas where other prisoners lined up for showers, tablets, and phones, leaving groups of men gathered outside her door and giving male officers an unobstructed view of her when she used the toilet or changed clothes. *Id.* at ¶27.

In response to her declaration stating the above factual allegations, ODOC notes that Doe's assignment to CCCF was brief because, during the November 2021 review, TAIC documented that Doe "had become aggressive towards others, changed her appearance and behavior to be more masculine, is calling other AICs derogatory names ("bitches", "whores"), has made no attempt to build relationships with others, grabs her genitals when walking by other AICs, and has been involved in multiple PREA allegations." Additionally, it was noted in the TAIC review that Doe was requesting to return to a male facility, preferably the Oregon State Penitentiary ("OSP"). Doe was returned to CCCF a second time on April 15, 2024, for her vulvoplasty and recovery, and she has remained there since. Jones Decl. ¶11.

### B.    S.S.

S.S. is a transgender woman whose gender is legally recognized as female. ODOC's own records classify her as female. For approximately six years she was housed at Two Rivers, a men's prison. S.S. Decl. ¶¶1–3 (ECF #17).

On or about September 3, 2023, S.S. was sexually assaulted by her cellmate. *Id.* at ¶5. Before the assault, she told ODOC and Oregon State Penitentiary staff that housing her with this person would put her at risk, but her warnings were ignored. *Id.* at ¶6. After the assault, S.S. claims that ODOC did not separate her from her attacker or move her to a safe unit. *Id.* at ¶6. She was denied immediate medical care and did not receive a forensic rape exam for eight days. *Id.* at ¶7.

ODOC adds the following facts to the record: S.S. entered the custody of ODOC in 2010 but did not identify as transgender until late 2018. Between 2018 and 2024, she requested to be housed at predominately male institutions. In mid-2024, a request for review for predominantly female housing came from her Qualified Mental Health Professional. S.S.'s release date was less than two months away. Accordingly, S.S. remained at a predominantly male facility until her release. Jones Decl. ¶12.

### C.    L.B.

L.B. is a transgender woman who has been on hormone replacement therapy for more than five years and has been legally recognized as female for several years. She is currently awaiting gender-affirming surgery. L.B. Decl. ¶1 (ECF #18). ODOC designates her as a "potentially vulnerable" inmate based on her transgender status and gender dysphoria diagnosis but continues to house her in men's prisons. *Id.* at ¶2.

Shortly after entering ODOC custody, L.B. began submitting grievances and kytes requesting safer housing and transfer to less violent facilities. *Id.* at ¶4. She reported repeated sexual harassment by other inmates, fear of using the gym because of harassment, and sexual harassment by her cellmate, including an incident where he groped her chest. *Id.* at ¶¶3–4. Towards the end of 2021, she was physically assaulted in a corridor and again sexually harassed

by the same cellmate. *Id.* at ¶5. To her knowledge, no report was filed, and ODOC forced her to remain housed with the assailant for months. *Id.* at ¶5.

L.B. wrote to the TAIC explaining that she could not safely shower or change clothes without being watched by male inmates, and she requested a transfer, which was denied. *Id.* at ¶8. Her mental health deteriorated to the point that she engaged in self-harm after being celled with someone she had previously reported. *Id.* at ¶9. She was later assaulted by another inmate, who repeatedly punched her in the head, forcing her to the ground. *Id.* at ¶10. L.B. claims that, after the attack, she was treated as the perpetrator by ODOC and placed into disciplinary segregation, until a hearing eventually cleared her. *Id.*

For years L.B. lived in general population housing at Snake River in Complexes 2 and 3, which she repeatedly reported were dangerous for her. *Id.* at ¶12. She asked to be moved to Complex 1, which she understood to be safer. *Id.* She communicated this request to both the prison superintendent and the superintendent of security, but she claims that her requests were ignored. *Id.* TAIC also declined to change her housing. *Id.* L.B. then made a request to the PREA lieutenant, and she was moved to Complex 1 for safety, but a captain moved her back to a dangerous unit the very next day. *Id.* at ¶13. That captain had been called as a witness in one of L.B.'s prior habeas cases, and she believes the move was motivated by retaliation. *Id.* She states that she has observed ODOC staff using their authority to move prisoners into dangerous units where they are likely to be targeted as retaliation for lawsuits and grievances. *Id.* at ¶14.

ODOC adds the following facts to the record: L.B. identified as non-binary upon admission to ODOC in December of 2019. Jones Decl. ¶12. L.B. requested to move to CCCF twice, and the requests were reviewed on October 2, 2022, and on February 7, 2023. *Id.* L.B.'s request was denied due to her assaultive crimes against women. *Id.* L.B. sexually abused a young

niece and physically assaulted a girlfriend. *Id.* L.B. also told the PREA Compliance Manager that she was safe in her current housing at a predominantly male facility. *Id.*

## DISCUSSION

The Court finds that Plaintiffs have carried their burden and have met the standard for a preliminary injunction. The prospective relief requested comports with the PLRA. The Court will hold an evidentiary hearing in the near future to ensure that the relief granted remains narrowly tailored and is the least intrusive means to correct the Eighth Amendment and Equal Protection violations in this case.[3]

## I.   Plaintiffs' Motion for a Preliminary Injunction is granted.

Plaintiffs are likely to succeed on the merits of at least two of their claims, and the law and the facts clearly favor Plaintiffs' position as to their claims under the Eighth Amendment. This meets the higher standard for a mandatory injunction. *Garcia*, 786 F.3d at 740. Plaintiffs have also shown a strong likelihood of irreparable harm in the absence of preliminary relief. The Court finds that the balance of equities tips in their favor and that an injunction is in the public interest. The motion for a preliminary injunction is GRANTED.

### A.   Plaintiffs are likely to succeed on the merits, and the law and the facts clearly favor Plaintiffs' position, as to their Eighth Amendment claims.

The Eighth Amendment imposes certain duties on prison or jail officials holding persons pursuant to a sentence: (1) to provide humane conditions of confinement; (2) to ensure that inmates receive adequate food, clothing, shelter and medical care; and (3) to "take reasonable

---

[3] Having found that Plaintiffs have met the standard for a preliminary injunction based on their two federal claims, and in the interests of judicial efficiency, the Court declines to consider whether the standard has been met as to the claim brought under the Oregon Constitution. Evaluation of that claim is not necessary to grant the relief requested.

measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

An Eighth Amendment claim must satisfy both an objective and a subjective component. *Farmer*, 511 U.S. at 834. Thus, a prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Id.* at 837. Reasonable safety includes safety from sexual assault by other inmates. *See id.*, at 847 (prison officials may be liable under Eighth Amendment where they failed to protect "transsexual" inmate from sexual assault in prison); *see also Bishop v. Hackel*, 636 F.3d 757, 766–67 (6th Cir. 2011); *Nelson v. Shuffman*, 603 F.3d 439, 447–48 (8th Cir. 2010) (evidence that plaintiff was assigned to a room with an inmate with a history of serious sexual and physical misconduct, who assaulted him, supported a deliberate indifference claim); *Johnson v. Johnson*, 385 F.3d 503, 527–30 (5th Cir. 2004) (allegation that officials were informed of repeated rapes of plaintiff, but took no action and told him to "learn to f*** or fight," stated an Eighth Amendment claim).

Here, Plaintiffs have shown that transgender women are vulnerable inmates and that they are often classified as such by ODOC. Defendants have not disputed the general contention that transgender women face a significantly higher-than-average likelihood of violence and sexual assault by cisgender male inmates in men's prisons. Nearly 35% of transgender people in state and federal prisons were sexually assaulted between 2007 and 2021, compared to less than 5% of the general prison population who experienced the same.[4]

---

[4] Plaintiffs cite to U.S. DEP'T OF JUSTICE OFF. OF JUSTICE PROGRAMS, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12, NCJ No. 241399, Supplemental Table 1 (2013). While this study was cited in Plaintiff's Reply brief (ECF #37), the parties each filed supplemental briefing post-oral argument hearing, and Defendants did not dispute the report, nor the facts presented.

In addition to the higher-than-average, known risk of violence, the named Plaintiffs and transgender declarants in this case have given numerous examples of the actual violence they have experienced, and ODOC's awareness of the risk of that violence. During her first PREA interview at Two Rivers in 2019, an officer asked J.F. why she was not housed at CCCF, noting that she presented as female, and stating that it was unsafe for her to remain at a male facility. J.F. Decl. ¶3. A cellmate at Two Rivers attacked her in her sleep, fracturing her orbital socket. *Id.* Another cellmate was a known gang member – both J.F. and the cellmate informed an officer that the placement was not safe, but no action was taken and the cellmate raped her. J.F. Decl. ¶5. Jane Doe was assaulted in the dayroom of a men's prison after months of transphobic comments and being regularly strip-searched in view of male prisoners and staff. Doe Decl. ¶¶4– 6. She requested a transfer to CCCF, but her requests were denied, and she was housed with a known sexually violent offender. Doe Decl. ¶¶7-8. She attempted to report to the PREA Compliance Manager, but she was told that she would "get over it." Doe Decl. ¶9. When Doe did report another assault, she told staff that the attacker's bodily fluid was still on her, but the evidence was not preserved, and she was not taken for a rape exam for nearly seven hours. Doe Decl. ¶21. Similarly, S.S. was sexually assaulted by her cellmate. S.S. Decl. ¶5. Before the assault, she had told ODOC and prison staff that housing her with this person would put her at risk. S.S. Decl. ¶6. Staff ignored her concerns, made no protective housing changes, and left her in the same cell. *Id.*

Defendants have not refuted the factual substance of the declarations submitted in support of Plaintiffs' claims. Instead, Defendants have asserted, in conclusory fashion, that the declarations are "disputed," and that many of the claims of violence are "unsubstantiated." *See* Sage Decl. (ECF #28). However, no personally-attested-to details about the investigations into

Page 17 — OPINION AND ORDER

these violent incidents have been offered in the record, nor has any documentation been offered to show that the violence is unsubstantiated or even exaggerated.

Instead of factually disputing the evidence of violence and sexual assault offered by Plaintiffs, Defendants justify housing Plaintiffs and declarants in men's facilities by pointing to other factors. For instance, Defendants state that J.F. is designated by ODOC as a "vulnerable" inmate, but she is not approved to be housed at CCCF due to safety concerns arising out of her criminal conviction, which involved a serious sex offense against a disabled female victim. Jane Doe's initial assignment to CCCF was brief, according to ODOC, because TAIC documented that she "had become aggressive towards others, changed her appearance and behavior to be more masculine, is calling other AICs derogatory names, has made no attempt to build relationships with others, grabs her genitals when walking by other AICs, and has been involved in multiple PREA allegations." S.S.'s requests for a transfer to CCCF were denied due to timing – her release date was less than two months away. L.B.'s requests for a transfer to CCCF were denied due to her conviction for assaultive crimes against women. These explanations add context to show the complex nature of inmate housing decisions, but none of them are responsive to the allegations that ODOC knew that each of these transgender women were at high risk of violence and sexual assault and failed to prevent it from occurring.

Crucially, Defendants do not substantively dispute that Plaintiffs or declarants experienced significant male violence, as alleged. Erika Sage is the PREA Coordinator at ODOC, and she submits a declaration stating that many of the Plaintiffs' and other transgender AICs' reports of violence discussed in this case are "unsubstantiated" or "unfounded." Sage Decl. ¶5-8 (ECF #28). She does not explain how such a determination was made in each reported instance. She also does not state whether any investigation was made into the allegations of

Page 18 — OPINION AND ORDER

violence and sexual assault that may not have been reported to the PREA Coordinator or through other PREA channels, such as when an AIC reports to an officer or other ODOC staff. Several of the declarants in this case stated that they reported incidents to ODOC staff or officers, and those incidents were ignored, or the transgender AIC was blamed as the instigator. Sage does not explain or offer any factual dispute about the details of these alleged incidents.

In addition, ODOC's explanations are not responsive to the allegation that a major cause of both the known higher risk of violence and the violence itself, was due to the default housing placement of transgender women in men's prison facilities. Defendants "reject Plaintiffs' assertion there is an ODOC policy categorically housing transgender women AICs at facilities designed for cisgender male AICs, written or unwritten." Jones Decl. ¶5. But the data submitted by Defendants speaks for itself. According to ODOC's own data, approximately 117 transgender women AICs have self-identified and are on the ODOC Transgender and Intersex Committee's caseload in ODOC custody. Jones Decl. ¶6. Twenty-six of those 117 have requested housing at CCCF, and eight transgender women are actually housed at CCCF. Jones Decl. ¶¶6, 11. ODOC explains that some transgender AICs may request placement at men's facilities for various reasons, including the possibility that some are not ready to come out as transgender to their friends, family, or other inmates. Jones Decl. ¶6. No declaration or other attested-to statement from a non-transfer-requesting transgender AIC has been submitted to support this explanation.

Defendants also conflate the importance of an individualized housing assignment, in order to protect vulnerable transgender and cisgender AICs from violence and sexual assault, with the need to conduct an initial evaluation to determine whether an AIC is genuinely transgender. They claim that they "are aware of at least one individual who asserted a transgender woman identity at intake and later recanted saying he only wanted to get put in a

Page 19 — OPINION AND ORDER

women's prison to "f*ck chicks." Defs.' Resp. at 22, citing Sage Decl. ¶12. However, as with the other assertions of disputes of fact, the Sage Declaration provides no supporting documentation or verifying information about this single instance of an insincere claim to be transgender. Certainly, an initial evaluation of an AIC's transgender status is an important step in the process, but none of the Plaintiffs or declarants in this case have a transgender status that is disputed or alleged to be false or insincere. Defendants have not offered evidence that any of the 117 currently-in-custody transgender AICs are not genuinely transgender. Thus, the narrative that there are AICs (or possibly only one AIC) who falsely claim to be transgender, is unsupported and irrelevant to this case. The relief requested here pertains to transgender AICs, not to AICs who are pretending to be transgender.

Considering all of the above, it is clear that, regardless of the PREA, which is meant to keep AICs safe, and the ODOC policies, which require individualized assessments, the current default housing for transgender women AICs is placement in men's facilities. Based on ODOC's own evidence, eight out of 117 total transgender AICs are placed at CCCF, which is less than seven percent. The fact that only 26 out of 117 requested a transfer is given little weight because the Court has no information about the other 91 AICs, including whether they are aware that requesting a transfer is required, or that it is even an option, to be considered for housing at CCCF.

Based on the record before the Court, the law and the facts favor Plaintiffs' position that ODOC and ODOC staff knew of the vulnerability of transgender inmates and knew of the violent and abusive histories of the men who have assaulted them. ODOC and ODOC staff knew of the significantly high risk of violence and sexual assault that would result from housing transgender women in men's prisons. Transgender AICs are nevertheless overwhelmingly

housed in men's facilities, and their reports of violence are ignored or insufficiently investigated; instead, transgender AICs experience retaliation and further lack of protection. These findings satisfy both the objective and the subjective components of deliberate indifference to a substantial risk of serious harm to transgender AICs in the form of ongoing violence and sexual assault. The facts and the law weigh in Plaintiffs' favor as to their Eighth Amendment claims.

### B.    Plaintiffs are likely to succeed on their Equal Protection Claim.

Under the Equal Protection Clause, state policies that classify based on sex are subject to at least intermediate scrutiny. It is well-established, and the parties agree, that discrimination against transgender individuals is discrimination based on sex and is subject to heightened scrutiny. *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019) (reasoning that gender identity itself is at least a "quasi-suspect class."); *Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Hecox v. Little*, 104 F.4th 1061, 1079 (9th Cir. 2024), as amended (June 14, 2024), cert. granted, 145 S. Ct. 2871 (2025); *Roe v. Critchfield*, 137 F.4th 912, 923 (9th Cir. 2025). Under heightened scrutiny, ODOC must show an "exceedingly persuasive justification" for treating transgender women differently from similarly situated cisgender women. *Karnoski*, 926 F.3d at 1200–01.

ODOC contends that it "does not discriminate against transgender women AICs in housing assignments or in any other decision." Def. Resp. (ECF #26) p. 20. Defendants argue:

> ODOC considers transgender women AIC's transgender identity in the context of their own safety, and the safety of other women, including other transgender women, when assessing and determining housing assignments. An AIC's gender identity is also a factor among nine others in making PREA assessments of vulnerability or aggression.

*Id*. Defendants insist that, currently, "no blanket policy exists" regarding transgender housing assignments. *Id*. at p. 21. According to ODOC's own data, however, approximately 117 transgender women AICs are on the TAIC's caseload. Jones Decl. ¶6. Twenty-six of those 117 have requested housing at CCCF, and only eight transgender women are actually housed at

Page 21 — OPINION AND ORDER

CCCF. *Id.* at ¶¶ 6, 11. Thus, 109 out of 117 transgender women are housed in a men's prison facility. The numbers overwhelmingly show that the current default presumption is that transgender women are housed in men's prisons, except in rare cases.

This default presumption is further evidenced by Defendants' argument that implementing a functionally similar default with the opposite presumption would be problematic:

> "Presumptive placement" of transgender women AICs at CCCF or a designated transgender unit would complicate protecting women AICs, including transgender women AICs, from AICs of any gender identity who seek to victimize women AICs and would be willing to assert a transgender identity to obtain with their preferred victims. ODOC has an important government objective in reducing potential sexual victimization by convicted and potential sexual predators at intake who may not be sincere in their asserted gender identity. Defendants are aware of at least one individual who asserted a transgender woman identity at intake and later recanted saying he only wanted to get put in a women's prison to "f\*\*k chicks." Sage Decl. ¶12.

Def. Resp. at p. 22. In other words, ODOC believes that it is less complicated to expose transgender women AICs to a known, high risk of sexual assault by housing them in a men's prison, than to expose cisgender women to some as-yet-unquantified risk of sexual assault from a transgender AIC. This argument does not have a rational basis in law or fact.

First, as discussed above, Defendants lack supporting documentation for even the single purported instance of a faked transgender identity, and they conflate the need for an initial evaluation of an AIC's genuine transgender status with the subsequent assessment of their housing placement in a facility that matches their gender identity. The relief requested in this case pertains to transgender AICs, not to AICs who are pretending to be transgender.

Second, Defendants argue that there are many reasons that transgender women in custody are unable to be placed at CCCF, such as their own violent conduct against women, or their own preferences for housing in a male facility. For instance, they point to J.F.'s history of violence

Page 22 — OPINION AND ORDER

and sexual aggression against other women as prohibitive. However, no explanation has been provided as to why J.F.'s violent history requires her continued housing in a men's prison. J.F. has female gender markers, is legally female, and has already experienced numerous instances of violence and sexual assault by cisgender men in men's prisons.

The Court is not naïve: housing someone with a complicated status of both "vulnerable" and "aggressive," is extremely challenging. However, the continued placement of a victimized transgender woman in a men's prison is undeniably different treatment than the treatment received by cisgender women, whose placement in a men's facility is never an option, regardless of their history of violence or sexual aggression. Moreover, ODOC's explanations for why J.F.'s history is relevant to her specific housing placement does not adequately explain why the default placement for all transgender women should be in men's facilities.

Finally, Defendants argue that "Presumptive Placement" at CCCF or specialized housing units would create a policy that treats transgender women differently. The Court disagrees. The current presumptive placement undeniably treats transgender and cisgender women differently, and Defendants do not provide an exceedingly persuasive justification, nor even a legitimate state interest or rational basis, for this different treatment. Nor have Defendants provided a justification for why cisgender women are more entitled to protection against male sexual violence than transgender women. This is the fundamental basis of Equal Protection.

The Court finds that it is more likely than not that ODOC has a default policy that treats transgender women as "male" for classification and housing purposes, notwithstanding their legal female identity, while treating cisgender women as female and housing them accordingly. Because ODOC cannot offer an exceedingly persuasive justification, or even a rational basis, for

categorically excluding transgender women from women's housing or other safe, alternative housing, Plaintiffs are likely to succeed on their Equal Protection Claim.

### C.    Plaintiffs have shown a likelihood of irreparable harm in the absence of preliminary relief.

Plaintiffs seeking a TRO or preliminary injunction must establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, Plaintiffs have shown that they suffer ongoing threats of violence and sexual assault, from their cellmates and from AICs in the general population at men's prison facilities, which have gone unheeded and unprevented by Defendants. Defendants state that the current ODOC and PREA policies are sufficient to address these assaults, but it fails to show that such a conclusory statement has any basis in reality for these inmates. Plaintiffs "need not await another assault before obtaining preventative relief." *Zombie v. State of Oregon*, No. 3:21-cv-01338-AA (D. Or. Sept. 8, 2023) at *6.

### D.    The balance of equities and the public interest tip in Plaintiffs' favor.

The final two factors of the preliminary injunction standard — the balance of equities and the public interest — merge when the government is a party. *Shilling v. United States*, 773 F. Supp. 3d 1069, 1106 (W.D. Wash. 2025) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)). The Court must balance the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief. *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843–44 (9th Cir. 2007).

The burden of providing safe housing for inmates who are both vulnerable and potentially violent is a steep challenge for any state government. The complexity of appropriately addressing issues of gender and gender identity creates even more challenges. However, as pointed out by the Defendants themselves, many of Plaintiffs' requests for relief are measures

Page 24 — OPINION AND ORDER

that are already mandated by PREA and ODOC policies. Therefore, ODOC must merely enforce and maintain the status quo when it comes to these policies, such as individualized housing and safety assessments. The most significant change, and thus the most significant burden on the Defendants and the Oregon prison system, is the default orientation towards housing transgender inmates in a facility that matches their gender identity instead of the default presumption of housing them in a men's prison.[5] The requested relief will certainly cause a need for ODOC staff training regarding this new orientation, as well significant logistical support, as they begin to re-assess the individual cases of each transgender AIC. A significant number of housing transfers could be initiated. ODOC may need to be creative in considering alternatives that are safe and non-punitive for transgender AICs who cannot be housed in men's prisons or at CCCF.

Nevertheless, these institutional burdens are significantly outweighed by the Plaintiffs' claims of ongoing violence and sexual assault, which they are currently subjected to in men's prisons. The public has an interest in protecting inmates' Eighth Amendment right to be free from deliberate indifference to their safety and in providing Equal Protection under the law. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

Here, the Court has determined that the facts and law are in Plaintiffs' favor regarding their claims under the Eighth Amendment, and the standard for mandatory injunctive relief has been met. This tips the balance of equities in Plaintiffs' favor, even if protecting transgender AICs from harm places a significant burden on the Defendants. However, in an abundance of caution, the Court will further consider the balancing of the equities by holding an in-person

---

[5] In addition to considering this overall burden in balancing the equities, the Defendants' objections to each specific form of requested relief will be further addressed below, when the Court considers the mandates of the PLRA.

Page 25 — OPINION AND ORDER

evidentiary hearing for the parties to present evidence as to Plaintiffs' requests for relief, as well as the potential burdens and hardships placed on ODOC and the Oregon prison system.

## II.    The relief requested by Plaintiffs comports with the PLRA.

The Prison Litigation Reform Act of 1995 ("PLRA") sets the standards for when a court may grant prospective relief concerning prison conditions. The PLRA instructs that a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The PLRA "mean[s] just what it says—before granting prospective injunctive relief, the trial court must make the findings" the PLRA mandates. *Oluwa v. Gomez*, 133 F.3d 1237, 1239 (9th Cir. 1998). We call those findings the "need-narrowness-intrusiveness" findings for short." *Armstrong v. Newsom*, 58 F.4th 1283, 1293 (9th Cir. 2023) (internal citations and quotations omitted.)

### A.    The Defendants have failed to substantively contest the factual record supporting the requested relief.

Defendants contend that a court "abuses its discretion when it relies on sparse, contested declarations that are not so pervasive to support the finding of a specific corrections culture when considering prospective relief under the PLRA." Defs.' Resp. at 15, citing *Armstrong*, 58 F.4th at 1300. In *Armstrong*, 58 F.4th 1283, the district court granted preliminary relief, and in doing so, relied on declarations by three AICs alleging incidents of prison staff spraying disabled inmates. *Id.* The defendants contested the alleged pepper-spraying incidents with supporting declarations. *Id.* The district court did not resolve the factual disputes between the parties or determine whether the additional uses of pepper spray were improper. *Id.* The Ninth Circuit found: "…the incidents of pepper-spray misuse on which the district court relied are not so pervasive to support

Page 26 — OPINION AND ORDER

a finding of a culture of improper pepper-spray use targeting inmates. Rather, the pepper-spray evidence is composed largely of single incidents that could be isolated." *Id.* at 1292. However, the Ninth Circuit upheld other portions of the preliminary relief granted in *Armstrong*, where the Court found the defendants failed to contest the factual record supporting the granted relief. *Id.* at 1294. It was only where the Ninth Circuit determined that the district court had failed to make sufficient findings resolving factual disputes that it struck down the district court's injunction for abuse of discretion. *Id.* at 1300-01.

This case is clearly distinguishable from the portions of *Armstrong*, 58 F.4th 1283, that the Ninth Circuit reversed. Here, it is Plaintiffs who have filed detailed, first-hand factual allegations of unaddressed violence and sexual assault, attested to by sworn declarations. Defendants have also filed several sworn declarations, but the substance of those declarations fails to dispute Plaintiffs' allegations with anything other than broad, conclusory claims that such allegations are "unsubstantiated." These conclusory claims are attested to by high-level ODOC staff with no personal or first-hand knowledge of the situations at issue. Defendants' evidence is insufficient to create a question of fact regarding whether Plaintiffs regularly experience violence and sexual assault by men in men's prisons. As discussed above, the Court will continue to develop the record in this case with an evidentiary hearing, and Defendants will have the opportunity to remediate their failure to dispute the factual record, which currently overwhelmingly favors the Plaintiffs.

> **B.    Each form of requested relief complies with the PLRA's need-narrowness-intrusiveness findings, with one minor amendment.**

The relief requested is necessary, least intrusive, and narrowly tailored to correct the constitutional violations that Plaintiffs have shown to be likely to succeed. One minor amendment is made by the Court to the third request, to remove the language allowing a

transgender AIC to be housed with a cellmate who is known to have a history of sexual or serious physical violence if the transgender AIC "gives informed, voluntary consent after a meaningful review of options." This language has been removed, and it is granted as amended.

> 1.    Immediately end the categorical housing of transgender women in men's facilities without individualized safety assessments and instead conduct prompt, case-by-case housing and classification reviews for all transgender women in ODOC custody, with a presumption of placement consistent with each woman's gender identity absent a documented and articulable security justification.

Defendants claim this relief is not narrowly tailored, and they claim that it would "discriminatorily privilege AICs who assert a transgender identity by granting them a due-process liberty interest in their housing, which no AIC possesses." Def Resp. p. 32. (ECF #26). The Court disagrees.

This relief does not grant any AIC a liberty interest in their housing, nor does it even privilege their preference for a particular facility.[6] As demonstrated by the sheer number of transgender inmates being housed in men's facilities, the Court has found that there is currently a categorical default placement of transgender women in men's prisons, with some very few exceptions. This relief reverses that paradigm based on the demonstrated higher risk of violence and sexual assault against transgender inmates in men's prisons.

The relief requested is narrowly tailored and least-intrusive because it maintains the current process of individualized safety assessments and case-by-case housing and classification reviews, which means that no specific outcome is mandated in any particular AIC's case.

---

6 Ironically, Defendants assert both that AICs do not have a liberty interest in their housing preference and that this relief is not in the best interest for those transgender women who prefer to be housed in men's prison facilities. It is unclear why changing the default standard to preference placement at the women's prison facility would suddenly grant a liberty interest in an AIC's housing placement, while the current system, preferencing the men's facilities, does not. ODOC represents to the Court that it already conducts individualized assessments and takes AIC's preferences into account. Therefore, this relief mandates almost nothing new, except a reorientation to a presumption that most transgender inmates should be placed in a facility that matches their gender identity instead of their assigned sex at birth.

Page 28 — OPINION AND ORDER

However, now, instead of the categorical default placement in a men's facility, the default will be to house the transgender inmate at CCCF or other alternative, safer housing. This addresses the Eighth Amendment violation of insufficient protection against male violence, and it also addresses the Equal Protection violation of different standards for transgender women than for cisgender women. This relief therefore complies with the PLRA.

> 2.    Provide safe, non-punitive housing options for transgender women, including (as appropriate) transfer to CCCF, voluntary transgender or gender non-conforming housing units within existing facilities, or other protective placements that do not involve involuntary segregation or loss of programming solely because of transgender status.

Defendants make the same objection here as above. The Court continues to disagree, for the same reasons. There is no constitutional right to incarceration in a facility of an inmate's choice, and there is no liberty interest in an AIC's housing preference. Nevertheless, if ODOC can create a standard whereby the housing default is determined by gender, then it can create a standard by which the housing default is determined by gender identity. If certain AICs cannot be housed at CCCF safely, then ODOC is required to find alternative housing that is non-punitive and still protective. This relief is necessary, least intrusive, and narrowly tailored to address the constitutional violations at issue.

> 3.    Prohibit housing transgender women with cellmates known to have a history of sexual or serious physical violence unless the transgender prisoner gives informed, voluntary consent after a meaningful review of options.

Defendants object to this relief because AICs have no right to select their cellmates. Defendants also note that "relief under the Eighth Amendment for an alleged failure to protect does not require informed, voluntary consent by an AIC – it requires only a remedy to the circumstances which give rise to the alleged failure." The Court agrees with Defendants, in part. Informed voluntary consent to a cellmate with a history of sexual or serious violence does not properly provide relief. Therefore, the Court amends the relief requested. The relief granted shall

Page 29 — OPINION AND ORDER

instead read: <u>Prohibit housing transgender women with cisgender cellmates known to have a history of sexual or serious violence.</u>

Other courts have found this to be an appropriate form of relief in cases where a transgender inmate continues to be raped or assaulted by her cisgender male cellmate with a history of violence and sexual assault. *See Zombie*, (D. Or. Sept. 8, 2023) (finding a high likelihood of success on an Eighth Amendment failure-to-protect claim and irreparable harm where ODOC housed transgender plaintiff with men convicted of sex crimes and failed to separate her from prior assailants). This relief is necessary, least intrusive, and narrowly tailored to address the constitutional violations at issue.

4.   <u>Ensure that transgender women have access to separate showers or shower schedules that provide reasonable bodily privacy from male prisoners and staff and implement policies to prevent forced exposure of nude bodies to male inmates.</u>

Defendants claim this relief is not compatible with Rule 65 because ODOC already grants access to separate showers and accommodates preferred gender searches when practicable:

> There are appropriate transgender showers at every ODOC facility, with the exception of a few facilities, in which transgender AICs are provided a separate shower time. Every ODOC facility has passed PREA audits in this regard. Transgender AICs are given the opportunity to shower privately.

Sage Decl. ¶10.

The evidence submitted by Defendants through the Sage declaration is evidence of ODOC policies, but it is not evidence of the realities of how such policies have been actually applied to the transgender AICs in this case, or to any other transgender AIC. By contrast, Plaintiffs have submitted declarations that dispute the efficacy and proper implementation of these policies. For example, L.B. wrote to ODOC's TAIC, explaining that she could not safely shower or change clothes without being watched by male inmates, but her request for a transfer

Page 30 — OPINION AND ORDER

was denied. L.B. Decl. ¶8. J.F. stated that her current housing "offers no meaningful privacy...

Showers lack privacy screens, allowing men to watch [her] undress." J.F. Decl. ¶17. Defendants

present no evidence from anyone with actual knowledge of the circumstances of these specific

AICs to dispute their declarations.

To the extent that ODOC is already in compliance with the PREA and its own policies

regarding private showers, the requested relief merely maintains the status quo. This relief is not

granted because the PREA creates a private cause of action – it does not – but because the ways

in which ODOC is failing to comply with the PREA also creates a violation of Plaintiffs' Eighth

Amendment and Equal Protection rights. Defendants have not shown that an order ensuring

compliance with these policies is incompatible with Rule 65. To the extent that ODOC is not

actually in compliance, which the Court has found likely based on the record in this case, ODOC

must alter its conduct to allow for private showers and bodily privacy for transgender AICs, both

from cisgender male AICs and male prison guards and staff. This relief is necessary, least

intrusive, and narrowly tailored to address the constitutional violations at issue.

> 5.      Require that unclothed searches of transgender women be conducted by female staff absent extraordinary, documented circumstances and prohibit cross-gender strip searches otherwise.

Defendants make the same objection here – that PREA and ODOC policies already

provide for this accommodation. They clarify, however that while the PREA states that ODOC

shall not permit cross-gender pat-down searches of female inmates, absent exigent

circumstances, "PREA does not define cross-gender in relation to transgender AICs." Sage Decl.

¶11. The implication, once again, is that protection from male violence is granted to cisgender

women but not to transgender women.

Nevertheless, the same analysis applies here, as above. To the extent that ODOC is in

compliance with their own policies, this relief generally maintains the status quo, but it adjusts

Page 31 — OPINION AND ORDER

the requirements such that transgender women are as protected from male violence as cisgender women. This relief is necessary, least intrusive, and narrowly tailored to address the constitutional violations at issue.

> 6.    Implement immediate, confidential, and non-retaliatory reporting mechanisms for sexual abuse, harassment, and threats, including effective PREA-compliant hotline access and prompt, good-faith investigations of all such reports with measures to protect reporters from retaliation.

Defendants make the same objection here as in the previous two requests for relief.

According to ODOC:

> AICs may report a PREA matter to any staff member, file a grievance, make a report via third party, and report to the Governor's office. PREA allegations are immediately triaged and forwarded to investigation. ODOC has zero tolerance for any retaliation for reporting, and allegations will be treated as confidentially as possible. All staff are trained on appropriate response to an allegation, and investigators received specialized investigative training, as required by the PREA standards. ODOC operates a PREA-compliant hotline.

Sage Decl. ¶¶16-17. The same analysis applies here as above. Plaintiffs have submitted first-hand experiences via declarations giving numerous detailed examples to show that these policies have not been properly applied to them. These declarations remain uncontested by anyone at ODOC with first-hand knowledge of their circumstances. Thus, to the extent that ODOC is in compliance with such policies, this relief maintains the status quo. To the extent that the policies are not being appropriately applied, as evidenced in the record in this case, ODOC must bring itself into compliance. This relief is necessary, least-intrusive, and narrowly tailored to address the constitutional violations at issue.

> 7.    Provide interim mental health support, including crisis counseling, for transgender women who report sexual abuse or exhibit suicidality related to unsafe housing or retaliation.

The same objections are made here, and the same analysis applies. This relief is necessary, least-intrusive, and narrowly tailored to address the constitutional violations at issue.

Page 32 — OPINION AND ORDER

III.    **Plaintiff's Motion for Provisional Class Certification is granted.**

A.    **Plaintiffs meet the Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy.**

One or more members of a proposed class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23. These Rule 23(a) prerequisites are often referred to in shorthand as numerosity, commonality, typicality, and adequacy. *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1324 (W.D. Wash. 2015). Plaintiffs meet the Rule 23(a) prerequisites.

1.    Numerosity

Plaintiffs bring this case as a putative class action under Rule 23(a) and 23(b)(2) on behalf of "all current and future transgender women in ODOC custody." Rule 23(a)(1) is met because joinder of all current and future transgender women in ODOC custody is plainly impracticable. Transgender women are incarcerated throughout multiple ODOC facilities, and the class, by definition, includes future prisoners whose identities are presently unknown.

2.    Commonality

"Numerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm" in a prison context. *See Parsons v. Ryan*, 754 F.3d 657, 681 (9th Cir. 2014) (citing a collection of cases). Here, Plaintiffs' claims relate to ODOC's systemic treatment of transgender women that preferences housing them, categorically, in men's prisons, such that they are exposed to a substantial risk of violence and sexual assault; these are allegations that can be resolved on a class-wide basis. Whether ODOC's current housing policies discriminatorily

Page 33 — OPINION AND ORDER

deny transgender women access to gender-consistent housing and safety measures in violation of the Equal Protection Clause can also be resolved on a class-wide basis. Plaintiffs seek injunctive and declaratory relief that would enjoin allegedly unconstitutional conduct as applied to the entire class, as well as systemic-wide reforms in the application of individualized housing assessments and class-wide protections, not just against violence and sexual assault, but against retaliation for reporting such violence to ODOC staff.

Defendants argue that the commonality requirement is lacking here because so many of the class members have not formally requested housing at CCCF and there is no evidence in the record that the class members who are not a named plaintiff or a declarant have actually suffered the harms of violence and sexual assault alleged here. A similar argument was made in *Rosas v. Baca*, No. CV 12-00428 DDP SHX, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012), where the defendant argued that commonality was lacking because "most class members have not been harmed in any way." That court disagreed, stating that, in a civil rights suit, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Id.* (citing *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), abrogated on other grounds by *Johnson v. California*, 543 U.S. 499 (2005)). "Under such circumstances, individual factual differences among class members pose no obstacle to commonality." *Id.; see also Spalding v. City of Oakland*, No. C11-2867 TEH, 2012 WL 994644, at *2 (N.D. Cal. Mar. 23, 2012).

Here, Plaintiffs contend that ODOC staff on every level knew of and were deliberately indifferent to the substantially high risk of violence and sexual assault created by a policy of categorically preferencing housing for transgender women in men's prison facilities. Regardless of an individual AIC's experience in custody, all class members are subject to that significant

Page 34 — OPINION AND ORDER

risk of excessive violence at the hands of male inmates and male staff in men's prisons. Resolution of these common questions is likely to yield a common answer to the Eighth Amendment and Equal Protection issues that Plaintiffs have raised on behalf of all transgender inmates. The commonality requirement is satisfied.

> 3.    Typicality

Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is a "permissive standard[ ]." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citation omitted). It "refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Parsons*, 754 F.3d at 685.

Defendants assert that some of the class members may oppose some of the proposed prospective relief requested, such as a transgender housing unit, or transfer to CCCF. Defendants also assert that J.F., the sole named Plaintiff still in ODOC custody, is not a typical member of the class because she has a potential sexual aggressor designation under PREA; therefore, her case presents significant factual disputes that will not be applicable to many other class members. The Court disagrees.

First, to the extent that some transgender women may prefer to be housed in a men's prison, or may have needs and factors that make housing at CCCF impracticable, the requested relief is not a homogenous transfer of all transgender AICs to one identified facility. The requested relief is an individualized housing assessment that preferences placement at a facility that matches the AIC's gender identity but does not require it. As discussed above, the current housing system already purports to conduct individualized housing and safety assessments, but it is alleged to have been deliberately indifferent to the significant risk created by preferencing placement in men's prisons. The change in this policy would apply to all class members, without

Page 35 — OPINION AND ORDER

dictating any specific placement. Plaintiffs' claims are therefore typical of the claims of absent class members, even those who may have different needs or preferences.

Second, the alleged constitutional violations at issue are alleged to be applicable to all transgender women who are housed in men's prisons by categorical default, regardless of the specific facts of their case or their potential status as "potentially aggressive." Even aggressors can be at high risk of violence and sexual assault, and even they are entitled to protection against in-custody male violence under the Eighth Amendment and Equal Protection Clause.

    4.    Adequacy

Finally, Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Here, Defendants raise the same contentions as they do above regarding typicality. The Court's analysis is therefore the same. While there may be differences in the facts of each class member, and each class member may ultimately be placed in different facilities, the requested relief will apply to the entire class and it will allow for the differences in needs and preferences for each individual AIC.

Defendants have not raised any issues with Plaintiffs and their counsels' ability to prosecute the action vigorously on behalf of the class, except to claim that Plaintiff S.D. will not adequately prosecute the class, as she is no longer in ODOC custody. The parties did not substantively brief that issue, however, and the Court does not find that S.D.'s potential lack of

Page 36 — OPINION AND ORDER

participation will render the class action ineffective. Either party may move to dismiss S.D. from the case if she does not intend to proceed. Additionally, the Court will hold further hearings requesting input from class members who may raise any potential conflicts or differences, and the adequacy of the representative parties may be raised at that time.

### B.    The Proposed Class is Provisionally Certified.

A class action may be maintained if Rule 23(a) is satisfied and if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Fed. R. Civ. P. 23(b)(2).

Defendants claim that ODOC has not "acted or refused to act on ground that applies to the proposed class" because it has allowed eight transgender women to be housed at CCCF, and its reasons for disallowing Plaintiffs and declarants are based on a case-by-case, factual determination that is not applicable to the rest of the class. However, as discussed above, Plaintiffs do not seek any specific, individual housing placement. They seek class-wide declaratory and injunctive relief that will govern ODOC's treatment of all transgender women in its custody by requiring individualized housing and safety assessments, presumptively gender-consistent placement, access to safe, non-punitive alternatives; and implementation of basic PREA and gender-affirming safeguards. This is precisely the type of relief Rule 23(b)(2) is designed to grant. Plaintiff's proposed class of all current and future transgender women in ODOC custody is provisionally certified.

### ORDER

Plaintiffs' Motion for Provisional Certification of a Rule 23 class and Motion for Preliminary Injunction (ECF #15) is GRANTED. The preliminary injunction shall remain in place for 90 days, and it may be renewed on a motion by the Plaintiffs.

Page 37 — OPINION AND ORDER

The Defendants shall immediately begin implementing the class-wide relief, re-assessing the housing placements of every transgender AIC currently in custody, as well as those entering ODOC custody from this date forward. The parties shall confer about the implementation of this Order, and a Joint Status Report is due every 30 days, updating the Court as to the progress being made towards implementation.

The Clerk shall schedule a telephonic status conference with the parties for the purpose of scheduling an in-person evidentiary hearing and setting further case deadlines.

It is so ORDERED and DATED this __28__ day of April, 2026

_____
MARK D. CLARKE
United States Magistrate Judge

Page 38 — OPINION AND ORDER